IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENDO PHARMACEUTICALS INC. and )
MALLINCKRODT LLC, )
                                         )
    Plaintiffs, )
                                         )
    v. )   C.A. No. 14-1381-RGA
                                         )
ACTAVIS INC. and ACTAVIS SOUTH )
ATLANTIC LLC, )
                                         )
    Defendants. )

**OPENING BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS COUNTS I, III AND IV
OF PLAINTIFFS' COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

YOUNG CONWAY STARGATT & TAYLOR LLP
Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
*apoff@ycst.com*
*rvrana@ycst.com*

OF COUNSEL:

HOLLAND & KNIGHT LLP
Charles Weiss
31 West 52nd Street
New York, NY 10019
(212) 513-3551
charles.weiss@hklaw.com

*Attorneys for Defendants Actavis Inc. and
Actavis South Atlantic LLC*

Dated: January 20, 2015

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................... 2

SUMMARY OF THE ARGUMENT ............................................................................. 3

STATEMENT OF FACTS .............................................................................................. 4

ARGUMENT ..................................................................................................................... 6

   I.  The Complaint does not plead sufficient facts to show intent to induce infringement of the '737 patent ........................................................................... 6

      A.  Endo has not pled sufficient facts to show that Actavis's future sales of the pending ANDA product will induce infringement of the '737 patent .......................... 7

      B.  Endo has not pled sufficient facts to show that Actavis induces infringement of the '737 patent by selling its already-approved extended-relief oxymorphone tablets ................................................................................................ 8

   II.  The '737 patent is invalid for claiming unpatentable subject matter under 35 U.S.C. § 101 ........................................................................................................ 9

CONCLUSION ................................................................................................................ 12

# **TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs. v. TorPharm, Inc.*,
    300 F.3d 1367 (Fed. Cir. 2002) ................................................................................. 7

*Artemi Ltd. v. Safe-Strap Co., Inc.*,
    947 F. Supp. 2d 473 (D.N.J. 2013) ............................................................................ 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................. 6

*AstraZeneca Pharms. LP v. Apotex Corp.*,
    669 F.3d 1370 (Fed. Cir. 2012) ............................................................................. 6, 7

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
    676 F.3d 1316 (Fed. Cir. 2012) ................................................................................. 8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 6, 9

*DSU Medical Corp. v. JMS Co., Ltd.*,
    471 F.3d 1293 (Fed. Cir. 2006) ................................................................................. 9

*Genetic Techs., Ltd. v. Bristol-Myers Squibb Co.*,
    __ F. Supp. 3d __, 2014 WL 5507637 (D. Del. Oct. 30, 2014) .............................. 10

*Genetic Techs., Ltd. v. Lab. Corp. of Am. Holdings*,
    Civ. No. 12-1736-LPS-CJB, 2014 WL 4379587 (D. Del. Sept. 3, 2014) ............... 10

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    131 S. Ct. 2060 (2011) .............................................................................................. 8

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
    681 F.3d 1323 (Fed. Cir. 2012) ................................................................................. 9

*In re Burlington Coat Factory Securities Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .................................................................................... 6

*Mallinckrodt, Inc. v. E-Z-Em Inc.*,
    670 F. Supp. 2d 349 (D. Del. 2009) .......................................................................... 9

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012) ............................................................................. 1, 9, 10, 11

*Morrow v. Balaski*,
    719 F.3d 160 (3d Cir. 2013) ...................................................................................... 6

*Ricoh Co. v. Quanta Computer Inc.*,
    550 F.3d 1325 (Fed. Cir. 2008) .................................................................................. 7

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003) ............................................................................... 6, 7

*Xpoint Techs., Inc. v. Microsoft Corp.*,
    730 F. Supp. 2d 349 (D. Del. 2010) .......................................................................... 9

**Statutes**

35 U.S.C. § 101 ..................................................................................................................... 3

35 U.S.C. § 271(a) ................................................................................................................ 2

35 U.S.C. § 271(b) ................................................................................................................ 6

35 U.S.C. § 271(c) ............................................................................................................ 6, 8

35 U.S.C. § 271(e)(2) ........................................................................................................... 2

**INTRODUCTION**

The complaint of plaintiffs (collectively, "Endo") alleges that defendants (collectively, "Actavis") have infringed U.S. Patents 8,808,737 ("the '737 patent") and 8,871,779 ("the '779 patent") by (i) selling an FDA-approved extended-release formulation of oxymorphone, and (ii) submitting an Abbreviated New Drug Application ("ANDA") seeking FDA approval for a different formulation of the same drug. Because this is a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the lengthy history of litigation between Endo and Actavis on these products is for now largely irrelevant, and in the interest of brevity Actavis will dispense with it in this brief.[1] With respect to the current part of that saga, Endo has related cases pending against Actavis in the (i) Southern District of New York for infringement of other patents allegedly infringed by the same product and ANDA (Civil Action Nos. 12-08985 and 13-00436), and (ii) District of New Jersey for false advertising of the commercial product (Civil Action No. 12-07591, *on remand from Endo Pharms. Inc. v. Actavis Inc.*, No. 13-4096, 2014 WL 6844812 (3d Cir. Dec. 5, 2014)).

Actavis now moves to dismiss Endo's claims for infringement of the '737 patent (Counts I, III, and IV), because (1) the Complaint fails to state a claim for indirect infringement (and cannot state a claim for direct infringement) and (2) all claims of the '737 patent are invalid for claiming a law of nature that is unpatentable under 35 U.S.C. § 101, namely, the relationship between bioavailability of oxymorphone and impaired kidney function. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012).

---

[1] Defendants follow the Complaint's lead of referring to both defendants collectively as "Actavis," because for present purposes it is not necessary to distinguish between them.

## NATURE AND STAGE OF THE PROCEEDINGS

In November 2014, Endo filed its Complaint for patent infringement (D.I. 1). It accuses one already-marketed product of infringement under 35 U.S.C. § 271(a), and accuses a pending ANDA of infringement under 35 U.S.C. § 271(e)(2).

As noted above, both the commercial product and the as-yet-unapproved product that is the subject of the ANDA are extended-release formulations of oxymorphone.[2] Oxymorphone is a opioid analgesic, and its use in extended-release form is for people who need strong, around-the-clock pain relief over lengthy periods of time.

In lieu of filing an Answer, Actavis is moving under Fed. R. Civ. P. 12(b)(6) to dismiss Endo's claims for infringement of the '737 patent (Counts I, III, and IV of the Complaint).

---

[2] The details of the products are not important for this motion, but the commercial product is generic to the original formulation of Endo's branded product Opana ER, and the pending ANDA seeks approval of a product generic to the current formulation of Opana ER.

## SUMMARY OF THE ARGUMENT

**1.** Because all claims of the '737 patent are directed to methods of treatment, Actavis can be liable only for indirect infringement. To state a claim, Endo must plead not just that the products at issue are <u>capable</u> of use by doctors (or patients) in an infringing manner, but that Actavis's instructions for use affirmatively <u>direct</u> their use in an infringing manner. As to the still-unapproved product described in Actavis's pending ANDA, the inquiry is limited to the product label, which does not direct use of the product in the manner claimed by the '737 patent. Endo has not pled, and cannot plead, that the label directs users (doctors or patients) to infringe.

As to the already-approved commercial product, the legal standard of induced infringement is same but the permissible inquiry is not automatically limited to the label. Specifically, although it is highly unusual for manufacturers of generic products to detail their use to physicians (in the way that manufacturers of branded products detail those products), it is at least theoretically possible that: (i) if such promotion occurred, and (ii) if that promotion directed physicians to use the product in a way not described on the label, the generic manufacturer could be found to induce infringement even if the label itself did not give directions for that use. But even if such activities are possible in theory, they are implausible in practice. And most importantly, they are not alleged by Endo in the Complaint.

**2.** All claims of Endo's '737 patent are invalid because they are directed to unpatentable subject matter under 35 U.S.C. § 101, *viz.*, a law of nature. Specifically, the claims recite the natural law that the bioavailability of oxymorphone is increased in people with impaired kidney function, and are not transformed into a patent-eligible "process" by reciting that doctors should "in dependence on" the measurement of kidney function give a "lower dosage" of drug.

3

**STATEMENT OF FACTS**

Claim 1 of the '737 patent is exemplary, and is reproduced below:

1. A method of treating pain in a renally impaired patient, comprising the steps of:
>  a. providing a solid oral controlled release dosage form, comprising:
>  
>  > i. about 5 mg to about 80 mg of oxymorphone or a pharmaceutically acceptable salt thereof as the sole active ingredient; and
>  >
>  > ii. a controlled release matrix;
>  
>  b. measuring a creatinine clearance rate of the patient and
>  
>  determining it to be (a) less than about 30 ml/min, (b) about 30 mL/min to about 50 mL/min, (c) about 51 mL/min to about 80 mL/min, or (d) above about 80 mL/min; and
>  
>  c. orally administering to said patient, in dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief;
>  
>  wherein after said administration to said patient, the average AUC of oxymorphone over a 12-hour period is less than about 21 ng·hr/mL.

'737 patent (D.I. 1, Ex. A) at 48:7-26. Dependent claims 2 and 3 specify that the AUC in the terminal "wherein" clause is less than about 20 and 19 ng·hr/mL, respectively.

Independent claim 4 is identical to claim 1, except the final clause reads "wherein after said administration to said patient, the Cmax of oxymorphone is less than about 1.4 ng/mL." Dependent claims 5 and 6 limit the Cmax to about 1.3 and 1.2 ng/mL, respectively.

Neither of the accused Actavis products (nor Endo's branded product Opana ER) are specially designed or labelled for treatment of pain in people with impaired kidney function. The only discussion in the labels (of all these products) on this point is (i) information about increased bioavailability of oxymorphone in people with renal impairment, and (ii) general

advice to start with a low dose in people with a creatinine clearance of less than 50 mL/min and to "titrate slowly" while monitoring side effects.

> **2.6 Patients with Renal Impairment**
>
> In patients with creatinine clearance rates less than 50 mL/min, start OPANA ER in the opioid-naïve patient with the 5 mg dose. For patients on prior opioid therapy, start OPANA ER at 50% lower than the starting dose for a patient with normal renal function on prior opioids and titrate slowly. Monitor patients closely for signs of respiratory or central nervous system depression.
>
> \*   \*   \*
>
> **8.7 Renal Impairment**
>
> Patients with moderate to severe renal impairment were shown to have an increase in oxymorphone bioavailability ranging from 57-65%. Start opioid naïve patients with the 5 mg dose of OPANA ER and titrate slowly while closely monitoring for respiratory and central nervous system depression. For patients on prior opioid therapy, start at 50% of the dose for a patient with normal renal function on prior opioids and titrate slowly.
>
> \*   \*   \*
>
> *Renal impairment*
> Data from a pharmacokinetic study involving 24 patients with renal dysfunction show an increase of 26%, 57%, and 65% in oxymorphone bioavailability in mild (creatinine clearance 51-80 mL/min; n=8), moderate (creatinine clearance 30-50 mL/min; n=8), and severe (creatinine clearance <30 mL/min; n=8) patients, respectively, compared to healthy controls.

Exhibit 1 at ¶¶ 2.6, 8.7, 12.3 (label of Opana ER, parenthetical references omitted); *see also* Exhibits 2 and 3 (labels for Actavis commercial product and pending ANDA product, respectively).[3]

---

[3] Exhibits are to the Declaration of Adam Poff in Support of Defendants' Motion to Dismiss.

**ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "requires more than labels and conclusion, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Unsupported conclusions, unwarranted inferences, and legal conclusions phrased as factual allegations also are not accepted as true for the purposes of a Rule 12(b)(6) motion. *See Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) ("[W]e are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.").

In ruling on motions to dismiss, courts may examine documents "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). In ANDA cases, the applicants' submissions to the FDA are in this category. *See AstraZeneca Pharms. LP v. Apotex Corp.*, 669 F.3d 1370, 1378 n.5 (Fed. Cir. 2012).

**I.  The Complaint does not plead sufficient facts to show intent to induce infringement of the '737 patent**

Because the '737 patent is directed to methods of treatment, the Complaint does not suggest that Actavis has practiced or will practice the claimed method. *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) (no direct infringement by drug manufacturer where patent is to method of treatment). Thus, Endo's claim must be based on induced infringement under 35 U.S.C. § 271(b) or contributory infringement under 35 U.S.C. § 271(c). *See id.* When as here the accused product has substantial noninfringing uses, intent to induce infringement requires not simply "knowledge that it may be put to infringing uses," but

"statements or actions directed to promoting infringement." *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1341 (Fed. Cir. 2008).

      **A.    Endo has not pled sufficient facts to show that Actavis's future sales of the pending ANDA product will induce infringement of the '737 patent**

For method-of-treatment claims like those in the '737 patent, an applicant's submission of an ANDA can be found to induce infringement only if it seeks approval to market the drug <u>for the patented use</u>. *See AstraZeneca*, 669 F.3d at 1379; *Warner-Lambert*, 316 F.3d at 1354-55. "Because drug manufacturers are bound by strict statutory provisions to sell only those products that comport with the ANDA's description of the drug, an ANDA specification defining a proposed generic drug in a manner that directly addresses the issue of infringement will control the infringement inquiry. *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002).

Here, the proposed label in the ANDA (Exhibit 3) does not direct physicians (or anyone else) to practice any claim of the '737 patent. Claim 1, which is representative, requires in part (i) measuring a person's creatinine clearance, (ii) determining if it is less than about 30 ml/min, about 30 to about 50 mL/min, about to about 80 mL/min, or above about 80 mL/min, and (iii) orally administering to the patient "in dependence on which creatinine clearance rate is found," a lower dosage of drug to provide pain relief. Nothing on the label directs doctors to perform <u>any</u> of these steps, and inducement would require that it direct the physician to perform <u>all</u> of them.

First, the label does not direct doctors to measure the creatinine clearance at all. Second, even if the creatinine clearance is measured, the label does not direct the doctor to "determine" if it falls within one of the four specified ranges. Third, it does not direct administration of a lower dose "in dependence on" which of the four ranges contains the measured creatinine clearance rate. Fourth, it does not direct giving a lower dose correlating to the four ranges "to provide pain relief," but instead speaks only to monitoring side effects. *Cf. Bayer Schering Pharma AG*

*v. Lupin, Ltd.*, 676 F.3d 1316, 1322-24 (Fed. Cir. 2012) (statements in label providing information on pharmacokinetics of a drug are not directions to infringe).

Endo's claim for contributory infringement similarly fails. There is no factual allegation that the product is "especially made or especially adapted for use in an infringement," and it is also plain on the face of the label that the product is "suitable for substantial noninfringing use. 35 U.S.C. § 271(c). *See also Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011) (contributory infringement under section 271(c) requires knowledge that the product will be used to infringe).

Accordingly, the Complaint fails to state a claim that commercial manufacture and sale of the proposed ANDA product with the label information submitted to the FDA for approval would infringe. Counts III and IV must be dismissed.

### B. Endo has not pled sufficient facts to show that Actavis induces infringement of the '737 patent by selling its already-approved extended-relief oxymorphone tablets

The label for Actavis's currently sold extended-release oxymorphone tablets (Exhibit 3) contains the same language regarding impaired kidney function as does the label for the proposed ANDA product. For the same reasons, Endo does not and cannot plead a claim for infringement based on the label itself.

Nor has Endo pled facts outside the label that would demonstrate indirect infringement. As noted above, it is at least theoretically possible in the case of a marketed product that the manufacturer could induce infringement by promoting (off-label) infringing uses. The question of whether allegations to that effect are sufficiently plausible is not at issue, because Endo has pled no facts to that effect. The only <u>fact</u> pled by Endo regarding the existing product is that Actavis sells it (Complaint ¶¶ 29-33).

8

But to survive a motion to dismiss, the Complaint "must contain facts plausibly showing that [defendants] specifically intended their customers to infringe [the '737 patent] and knew that the customer's acts constituted infringement." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012). Induced infringement requires "purposeful, culpable expression and conduct." *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). A complaint that merely recites the elements for indirect infringement is insufficient to state a claim. *See Xpoint Techs., Inc. v. Microsoft Corp.*, 730 F. Supp. 2d 349, 357 (D. Del. 2010); *Mallinckrodt, Inc. v. E-Z-Em Inc.*, 670 F. Supp. 2d 349, 354 (D. Del. 2009); *Artemi Ltd. v. Safe-Strap Co., Inc.*, 947 F. Supp. 2d 473, 480 (D.N.J. 2013).

Here, the only statement in the Complaint regarding induced infringement of the '737 patent is a legal conclusion that Actavis's sale of the accused product induces infringement:

> 37. Actavis's commercial manufacture, offer for sale, or sale of its Generic Oxymorphone ER Tablets infringe the '737 Patent under 35 U.S.C. § 271(a)-(c), including without limitation that it induces physicians and patients to infringe the '737 Patent by performing all of the recited steps of one or more of claims 1 – 6 of the '737 Patent.

Complaint ¶ 37. Unlike well-pled and plausible facts, which generally must be taken as true on a motion to dismiss, legal conclusions such as this have no weight and do not carry Endo's burden to state a claim for indirect infringement. *Twombly*, 550 U.S. at 555. Thus, Count I must be dismissed.

## II. The '737 patent is invalid for claiming unpatentable subject matter under 35 U.S.C. § 101

In *Mayo*, the Supreme Court held invalid a method of treatment claim highly analogous to the claims of the '737 patent for claiming unpatentable subject matter because the method of treatment claimed did nothing more than state a natural law governing the effects of a certain drug on the human body and add routine and conventional treatment steps by a physician.

9

Following *Mayo*, the District of Delaware has repeatedly dismissed similar claims as invalid at the pleading stage for claiming similar unpatentable subject matter. *See, e.g.*, *Genetic Techs., Ltd. v. Bristol-Myers Squibb Co.*, __ F. Supp. 3d __, 2014 WL 5507637, *6-*12 (D. Del. Oct. 30, 2014) (method of analyzing and amplifying natural variations in non-coding DNA held invalid on motion to dismiss); *Genetic Techs., Ltd. v. Lab. Corp. of Am. Holdings*, Civ. No. 12-1736-LPS-CJB, 2014 WL 4379587, *10-*14 (D. Del. Sept. 3, 2014) (method of analyzing DNA to predict athletic performance held invalid on motion to dismiss).

The claim language held invalid in *Mayo* is provided in the table below comparing that language to exemplary Claim 1 of the '737 patent:

| Claim 1 of the patent held invalid in *Mayo* 132 S. Ct. at 1295 | Claim 1 of the '737 patent |
|---|---|
| 1. A method of optimizing therapeutic efficacy for treatment of an immune-mediated gastrointestinal disorder, comprising: | 1. A method of treating pain in a renally impaired patient, comprising the steps of: |
| (a) administering a drug providing 6-thioguanine to a subject having said immune-mediated gastrointestinal disorder; and | a. providing a solid oral controlled release dosage form, comprising: i. about 5 mg to about 80 mg of oxymorphone or a pharmaceutically acceptable salt thereof as the sole active ingredient; and ii. a controlled release matrix; |
| (b) determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder, | b. measuring a creatinine clearance rate of the patient and determining it to be (a) less than about 30 ml/min, (b) about 30 mL/min to about 50 mL/min, (c) about 51 mL/min to about 80 mL/min, or (d) above about 80 mL/min; and<br><br>c. orally administering to said patient, in dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief; |
| wherein the level of 6-thioguaninine less than about 230 pmol per $8 \times 10^8$ red blood cells indicates a need to increase the amount of said drug subsequently administered to said subject | wherein after said administration to said patient, the average AUC of oxymorphone over a 12-hour period is less than about 21 |

| | |
|---|---|
| and<br><br>wherein the level of 6-thioguaninine greater than about 400 pmol per $8 \times 10^8$ red blood cells indicates a need to decrease the amount of said drug subsequently administered to said subject. | ng·hr/mL. |

In analyzing the claim in *Mayo*, the Supreme Court observed that the patent sets forth a law of nature, "namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." 132 S. Ct. at 1296. Such relationships are natural laws because they are a consequence of the ways in which drugs are metabolized, which are entirely natural processes. *Id.* at 1297. To become patent eligible, the claims would have to add enough to the law of nature to qualify as a patent-eligible process that applies natural laws. *Id.*

The Supreme Court held that the additional steps in *Mayo* did not add enough to confer patentability. It held that the "administering" step did nothing more than limit the relevant audience to "doctors who treat patients with certain diseases with thiopurine drugs," and that merely limiting a natural law to a particular technological environment did not render the claim patent-eligible. *Id.* at 1297. The "wherein" clauses simply told the doctor what the relevant natural laws were, at most suggesting that doctors take the laws into account when treating patients. *Id.* And the "determining" step tells the doctor to determine the level of the relevant metabolites in the blood. *Id.* Because the patents stated that such methods were well-known in the art, the "determining" step was conventional "pre-solution activity" that did not apply the law of nature in a way to create a patent-eligible process. *Id.* at 1298.

The '737 patent has many of the same flaws. As in *Mayo*, the '737 patent states a natural law: the bioavailability of oxymorphone is increased in patients with renal impairment. Indeed, it describes the invention using that exact language. D.I. 1, Ex. A at Abstract.

11

The claims' other steps are a "providing" step, a "measuring/determining" step, and an "administering" step. The "providing" and "administering" steps, like the "administering" step in *Mayo*, simply defines the audience, and the patent states that (i) extended-release oxymorphone was already on the market (D.I. 1, Ex. A at 3:40-49), and that oxymorphone is "widely used in the treatment of acute and chronic pain." *Id.* at 1:19-22.

The "measuring/determining" step tells the doctor to measure the patient's creatinine level to determine the severity of renal impairment, but the specification necessarily describes this as a known method. D.I. 1, Ex. A at 28:4-11, 28:61-29:15. Like the "determining" step in *Mayo*, this is just routine pre-solution activity using well-known methods to gather the information needed to apply the natural law.

None of these infirmities illustrated with respect to exemplary Claim 1 is eliminated by elements of the remaining claims, and thus they fall together with Claim 1 for the same reason.

## **CONCLUSION**

For the foregoing reasons, Actavis respectfully urges the Court to grant its motion and dismiss Counts I, III, and IV of the Complaint.

|  |  |
|---|---|
|  | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Of Counsel: | */s/ Adam W. Poff* |
|  | Adam W. Poff (No. 3990) |
| HOLLAND & KNIGHT LLP | Robert M. Vrana (No. 5666) |
| Charles Weiss | Rodney Square |
| 31 West 52nd Street | 1000 North King Street |
| New York, NY 10019 | Wilmington, DE 19801 |
| (212) 513-3551 | (302) 571-6600 |
| charles.weiss@hklaw.com | *apoff@ycst.com* |
|  | *rvrana@ycst.com* |
| Dated: January 20, 2015 |  |
|  | *Attorneys for Defendants Actavis Inc. and Actavis South Atlantic LLC* |

# CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on January 20, 2015, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Jack B. Blumenfeld, Esquire
>Julia Heaney, Esquire
>Morris Nichols Arsht & Tunnell LLP
>1201 North Market Street
>P.O. Box 1347
>Wilmington, DE 19899-1347
>*jblumenfeld@mnat.com*
>*jheaney@mnat.com*
>
>*Attorneys for Plaintiffs*

I further certify that on January 20, 2015, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following:

>Jonathan D.J. Loeb, Esquire
>Dechert LLP
>2440 W. El Camino Real
>Suite 700
>Mountain View, CA 94040
>*jonathan.loeb@dechert.com*
>
>Martin J. Black, Esquire
>Dechert LLP
>Circa Centre
>2929 Arch Street
>Philadelphia, PA 19104
>*martin.black@dechert.com*
>
>Robert D. Rhoad, Esquire
>Dechert LLP
>902 Carnegie Center
>Suite 500
>Princeton, NJ 08540
>*robert.rhoad@dechert.com*

01:16529567.1

Dated:   January 20, 2015    YOUNG CONAWAY STARGATT &
                              TAYLOR, LLP

                              */s/  Adam W. Poff*
                              Adam W. Poff (No. 3990)
                              Robert M. Vrana (No. (5666)
                              Rodney Square
                              1000 N. King Street
                              Wilmington, Delaware 19801
                              *apoff@ycst*.com

                              *Attorneys for Defendants*