IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENDO PHARMACEUTICALS INC. and MALLINCKRODT LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 14-1381 (RGA) |
| ACTAVIS INC. and ACTAVIS SOUTH ATLANTIC LLC, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COUNTS I, III, AND IV OF COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(B)(6)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com

OF COUNSEL:

Jonathan D. Loeb
DECHERT LLP
2440 W. El Camino Real, Suite 700
Mountain View, CA 94040
(650) 813-4800

*Attorneys for Plaintiffs*

Martin J. Black
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Robert D. Rhoad
Brian M. Goldberg
DECHERT LLP
902 Carnegie Center, Suite 500
Princeton, NJ 08540
(609) 955-3200

*Attorneys for Endo Pharmaceuticals Inc.*

Jeffrey J. Toney
Marcus A. Barber
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
(650) 453-5170

Rodney R. Miller
Paul G. Williams
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1349 W. Peachtree Street, N.W., Suite 1500
Atlanta, GA  30309
(404) 260-6080
*Attorneys for Mallinckrodt LLC*
February 27, 2015

**TABLE OF CONTENTS**

Page

NATURE AND STAGE OF THE PROCEEDINGS ................................................... 1

SUMMARY OF THE ARGUMENT ........................................................................ 1

STATEMENT OF FACTS ....................................................................................... 2

      A.   Opana® ER Tablets and the Patented Technology ................................... 2

      B.   Actavis's Generic Oxymorphone Tablets ................................................. 3

      C.   Actavis's Product Labels ......................................................................... 4

ARGUMENT ......................................................................................................... 5

    I.    GOVERNING STANDARDS ............................................................... 6

      A.   Motion To Dismiss ................................................................................. 6

      B.   Inducement To Infringe .......................................................................... 6

      C.   Patentable Subject Matter Under Section 101 ......................................... 7

    II.   ENDO ADEQUATELY PLED ITS CLAIMS FOR INDUCED
        INFRINGEMENT ................................................................................. 8

      A.   Endo Has Given Actavis Adequate Notice of What It Must Defend ........ 8

      B.   When Read Properly, in their Entirety, the Actavis Labels Confirm
          the Viability of Endo's Inducement Claims ............................................. 9

      C.   The Cases on Which Actavis Relies are Inapposite ............................... 11

      D.   Even if the Court Were to Find that Endo's Claims Are
          Inadequately Pled, the Proper Remedy Would Be to Grant Leave
          to File an Amended Complaint ............................................................... 13

    III.  THE '737 PATENT IS NOT INVALID FOR CLAIMING
        UNPATENTABLE SUBJECT MATTER ........................................... 13

      A.   The '737 Patent Is Directed to Patentable Subject Matter—
          Methods of Using a Particular Drug to Treat a Specific Medical
          Condition in a Specific Patient Population ............................................. 14

          1.   *Classen* Compels the Conclusion that the Claims at Issue
              Are Patent Eligible ..................................................................... 15

          2.   *Mayo* Does Not Dictate a Different Conclusion ......................... 16

          3.   Applying the *Alice* Two-Part Test Confirms the
              Patentability of the Claims at Issue ............................................. 19

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Johnson and Johnson, Inc.,*
524 F.Supp.2d 553 (D.Del. 2007) ........................................................................13

*Alice Corp. Pty, Ltd. v. CLS Bank Int'l,*
134 S. Ct. 2347 (2014) ............................................................................... passim

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..............................................................................................6

*AstraZeneca LP v. Apotex Inc.,*
633 F.3d 1042 (Fed. Cir. 2010) ........................................................................7, 11

*AstraZeneca Pharms. LP v. Apotex Corp.,*
669 F.3d 1370 (Fed. Cir. 2012) ...........................................................................12

*Bayer Schering Pharma AG v. Lupin, Ltd.,*
676 F.3d 1316 (Fed. Cir. 2012) ...........................................................................12

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ..........................................................................................7, 9

*Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.,*
527 F.3d 1278 (Fed. Cir. 2008) .............................................................................3

*Classen Immunotherapies, Inc. v. Biogen IDEC,*
2012 WL 3264941 (D. Md. 2012) ..................................................................17, 18

*Classen Immunotherapies, Inc. v. Biogen Idec,*
659 F.3d 1057 (Fed. Cir. 2011) ..........................................................15, 16, 17, 18

*Conley v. Gibson,*
355 U.S. 41 (1957) ................................................................................................6

*Diamond v. Diehr,*
101 S. Ct. 1048 (1981) ..................................................................................7, 8, 14

*Foman v. Davis,*
371 U.S. 178 (1962) ............................................................................................13

*Fowler v UPMC Shadyside,*
578 F.3d 203 (3rd Cir. 2009) .................................................................................6

*Genetic Techs., Ltd. v. Bristol-Myers Squibb Co.*,
   2014 WL 5507637 (D. Del. 2014) ........................................................................18

*Genetic Techs., Ltd. v. Lab. Corp. of Am. Holdings, Inc.*,
   2014 WL 4379587 (D. Del. 2014) ........................................................................18

*In re Bill of Lading*,
   681 F.3d 1323 (Fed. Cir. 2012)....................................................................6, 7, 9

*InvestPic, LLC v. FactSet Research Sys.*,
   2011 WL 4591078 (D. Del. 2011) ........................................................................20

*Mark IV Indus. Corp. v. Transcore, L.P.*,
   2009 WL 4828661 (D. Del. 2009) ..........................................................................7

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012)............................................................................... passim

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997).....................................................................................6

*Novartis Pharms. Corp. v. Actavis, Inc.*,
   2012 WL 6212619 (D. Del 2012) ..........................................................................12

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012)...............................................................................6

*Ultramercial, Inc. v. Hulu*, LLC,
   722 F.3d 1335 (Fed. Cir. 2013)............................................................................20

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003).............................................................................12

*WildTangent, Inc. v. Ultramercial, LLC*,
   134 S. Ct. 2870 (2014)...........................................................................................20

**STATUTES**

21 U.S.C. § 355(j) .........................................................................................................3

35 U.S.C. § 101 .................................................................................................. passim

35 U.S.C. §§ 102 and 103 ...........................................................................................20

35 U.S.C. § 271 (a)-(c)...............................................................................................8, 9

**Page(s)**

35 U.S.C. § 271(b) ..........................................................................................................6

35 U.S.C. § 271(e)(2) ........................................................................................3, 8, 11, 12

**OTHER AUTHORITIES**

FED. R. CIV. P. 15(a)(2) ..................................................................................................13

FED. R. CIV. P. 8(a) ..........................................................................................................1

## NATURE AND STAGE OF THE PROCEEDINGS

This is one of nine related Hatch-Waxman Act patent infringement lawsuits that Plaintiffs Endo Pharmaceuticals Inc. ("Endo") and Mallinckrodt LLC ("Mallinckrodt") filed in this District against generic companies that have filed Abbreviated New Drug Applications ("ANDAs") relating to Endo's Opana® ER tablets.[1]  In each case, Plaintiffs assert that the defendant's submission of its ANDA to the FDA infringes two patents listed in the FDA's "Orange Book" with respect to Opana® ER.  Defendants in this action—Actavis Inc. and Actavis South Atlantic LLC (collectively "Actavis")—have filed two such ANDAs, one of which has been approved, such that Actavis is already selling one of its two versions of generic Opana® ER.  Plaintiffs assert that those sales also infringe the patents-in-suit.

Actavis filed a motion to dismiss Plaintiffs' claims relating to one of the two patents-in-suit—U.S. Patent No. 8,808,737 ("the '737 Patent").  No other defendant has filed a motion to dismiss.

## SUMMARY OF THE ARGUMENT

Actavis argues that Endo cannot succeed on a claim for indirect infringement of the '737 Patent, and that the claims of the '737 Patent are directed to unpatentable subject matter.  Neither argument has merit, particularly at this stage of the proceedings where Endo's allegations and all inferences from them must be accepted as true.

The Complaint puts Actavis on notice of Endo's induced infringement theories, and satisfies the basic pleading standards of Rule 8(a).  Rather than rendering Endo's allegations implausible, the product labels on which Actavis's motion is based confirm that Actavis has and will induce infringement of the '737 Patent.

---

[1] *See also* 1:14-cv-1382-RGA (Amneal); 1:14-cv-1389-RGA (Barr/Teva); 1:14-cv-1383-RGA (Impax); 1:14-cv-1385-RGA (Par);1:14-cv-1386-RGA (Ranbaxy); 1:14-cv-1387-RGA (Roxane); 1:14-cv-1388-RGA (Sandoz); and 1:14-cv-1384-RGA (ThoRx/Impax).

With respect to patentable subject matter, the claims recite methods of using a particular drug (oxymorphone) to treat a specific medical condition (pain) in a specific patient population (patients with renal impairment) using a modified treatment regimen (lowering the dose of oxymorphone based upon the degree of severity of the renal impairment). They are thus directed to a patent eligible "new and useful process," not a patent ineligible abstract idea or natural law.

## STATEMENT OF FACTS

### A.    OPANA® ER TABLETS AND THE PATENTED TECHNOLOGY

Endo makes and sells a variety of prescription pharmaceutical products used, among other things, to treat and manage pain. Complaint (D.I. 1) at ¶ 1. Endo's premier branded product is Opana® ER, an extended-release (ER) pain medication that contains oxymorphone hydrochloride as the sole active ingredient. *Id.* at ¶¶ 1, 19. Endo has sold two versions of Opana® ER—the original formulation launched in 2006, as well as a subsequent crush-resistant formulation designed to deter potential abuse by drug abusers seeking to crush and then snort the tablets. Actavis Ex. 1[2] ("Opana® ER Label") at §5.1; Complaint at ¶ 19.

The '737 Patent is directed to methods of treating pain in renally impaired patients with oxymorphone by using a different treatment regimen than is used for patients with normal renal function. *See* Ex. A to Complaint. Representative claim 1 recites:

> 1. A method of treating pain in a renally impaired patient, comprising the steps of:
>   a. providing a solid oral controlled release dosage form, comprising:
>     i. about 5 mg to about 80 mg of oxymorphone or a pharmaceutically acceptable salt thereof as the sole active ingredient; and
>     ii. a controlled release matrix;
>   b. measuring a creatinine clearance rate of the patient and determining it to be (a) less than about 30 ml/min, (b) about 30 mL/min to about 50 mL/min, (c) about 51 mL/min to about 80 mL/min, or (d) above about

---

[2] References herein to "Actavis Ex.__" refer to the corresponding exhibit attached to the Declaration of Adam W. Poff, submitted by Actavis in support of its motion to dismiss.

80 mL/min; and

    c. orally administering to said patient, in dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief;

    wherein after said administration to said patient, the average AUC of oxymorphone over a 12-hour period is less than about 21 ng·hr/mL.

Thus, the claimed methods include the steps of: a) providing a controlled release dosage form of oxymorphone; b) measuring a patient's creatinine clearance rate (which is indicative of renal function)[3]; and c) administering to the patient, depending on the severity of the renal impairment as measured by the patient's creatinine clearance rate, a lower dosage of the oxymorphone dosage form to provide pain relief. The only other independent claim, claim 4, recites the same limitations (a)-(c) as claim 1, and requires that after administration to the patient, the Cmax of oxymorphone is less than about 1.4 ng • hr/mL.

## B.    ACTAVIS'S GENERIC OXYMORPHONE TABLETS

Actavis filed its ANDAs pursuant to the so-called "Hatch-Waxman Act," which provides generics with a faster and less costly path to obtaining FDA approval by allowing them to piggyback upon the safety and efficacy data that the innovator company included in its NDA. *See* 21 U.S.C. § 355(j). Under that Act, the filing of an ANDA seeking approval to market a generic product prior to the expiration of a patent covering the brand name product is an act of patent infringement. *See* 35 U.S.C. § 271(e)(2).[4]

Generic manufacturers have filed 15 separate ANDAs seeking approval to market generic versions of Opana® ER. In 2008, Actavis filed its first ANDA, seeking approval for a generic

---

[3] Creatinine is a waste product produced during normal muscle breakdown in the body and is normally filtered by the kidneys into the urine. The rate at which a patient's kidneys can make a certain volume of blood creatinine-free per unit of time is that patient's creatinine clearance rate. Creatinine clearance rates reflect kidney function, with abnormally low rates indicating that kidney functioning is impaired - the lower the rate indicating the more severe the impairment.

[4] For a detailed description of the Hatch-Waxman Act and related ANDA patent litigation, *see Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1282-86 (Fed. Cir. 2008).

version of Endo's original Opana® ER formulation ("Actavis Non-CRF Tablets"). The FDA has approved that ANDA, and Actavis has been selling those Tablets since 2011. Actavis also filed an ANDA seeking approval for a generic version of the later crush-resistant formulation of Opana® ER, which is still pending before the FDA. *See* Complaint, ¶¶ 29-35.

### C.    ACTAVIS'S PRODUCT LABELS

The product labels for the Actavis CRF and Non-CRF Tablets are largely identical and will be addressed collectively as the "Actavis Labels."[5] As stated in those Labels, the Actavis Tablets are indicated for the treatment of "moderate to severe pain," and Actavis instructs physicians to "Individualize dosing based on patient's prior analgesic treatment experience, and titrate as needed to provide adequate analgesia and minimize adverse reactions." Actavis Ex. 3 at 1.[6] Consistent therewith, Actavis instructs physicians to "Reduce the dose of oxymorphone hydrochloride extended-release tablets in . . . patients with renal impairment," *see, e.g.,*:

------------------**DOSAGE AND ADMINISTRATION**------------------
- Individualize dosing based on patient's prior analgesic treatment experience, and titrate as needed to provide adequate analgesia and minimize adverse reactions (2 1, 2 2,)
- Administer on an empty stomach, at least 1 hour prior to or 2 hours after eating (2 1)
- Instruct patients to swallow oxymorphone hydrochloride extended-release tablets intact (2 4)
- Do not abruptly discontinue oxymorphone hydrochloride extended-release tablets in a physically dependent patient (2 3, 5 13)
- Reduce the dose of oxymorphone hydrochloride extended-release tablets in patients with mild hepatic impairment and patients with renal impairment (2 5, 2 6)
- Oxymorphone hydrochloride extended-release tablets should be taken one tablet at a time, with enough water to ensure complete swallowing immediately after placing in the mouth (2 1, 17)

*Id.* (emphasis added). This instruction is followed by cross-references to subsequent sections that give additional guidance regarding how to treat renally impaired patients, including

---

[5] All citations to the Actavis Labels will be to specific sections of the product label for Actavis's Non-CRF Tablets (Ex. 3), with the understanding that corresponding sections exist in the proposed product label for Actavis's CRF Tablets, except where otherwise noted.

[6] Corresponding instructions are found in the Actavis CRF Tablets label at sections 2.1 "Initial Dosing" and 2.2 "Titration and Maintenance of Therapy." Actavis Ex. 2.

information regarding differences in the extent to which oxymorphone is absorbed into patients' bloodstreams depending on the degree of severity of their renal impairment (as delineated by their creatinine clearance rates), and correlating those levels of impairment with appropriate dosages (*see id.* at 6-7, 16, and 23), including for example, instructions to significantly lower the dose for patients with a creatinine clearance rate below a specified threshold:

> **2.6 Patients with Renal Impairment**
> In patients with creatinine clearance rates less than 50 mL/min, start oxymorphone hydrochloride extended-release tablets in the opioid-naïve patient with the 5 mg dose. For patients on prior opioid therapy, start oxymorphone hydrochloride extended-release tablets at 50% lower than the starting dose for a patient with normal renal function on prior opioids and titrate slowly. Monitor patients closely for signs of respiratory or central nervous system depression *[see Warnings and Precautions (5.2), Use in Specific Populations (8.7) and Clinical Pharmacology (12.3)]*.

*Id.* at 6-7. Similarly, § 8.7 instructs that patients with "moderate to severe renal impairment were shown to have an increase in oxymorphone bioavailability ranging from 57%-65%," such that dosing for these patients should be "titrate[d] slowly." *Id.* at 16.[7]

## **ARGUMENT**

Endo alleges that the filing of Actavis's ANDAs and the commercial sale of its CRF Tablets have and will actively induce physicians and/or patients to infringe the '737 Patent. Complaint at ¶¶36-37, 41-45, 46-52. The Actavis Labels affirmatively instruct physicians and patients to perform all of the recited steps of the claimed inventions. Thus, rather than rendering Endo's allegations implausible, those Labels confirm that Actavis has and will induce infringement by the physicians and/or patients who receive and implement those instructions. The Court should reject Actavis's motion to dismiss.

---

[7] Section "12.3 Pharmacokinetics" associates the degree of severity of renal impairment levels with specific creatinine clearance rates – defining "mild" renal impairment as "creatinine clearance 51-80 mL/min"; "moderate" renal impairment as "creatinine clearance 30-50 mL/min" and "severe" renal impairment as "creatinine clearance <30 mL/min." *Id.* at § 12.3.

# I.     GOVERNING STANDARDS

## A.     MOTION TO DISMISS

In order to sufficiently plead a claim, "all [that is] require[d] is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (citing Fed. R. Civ. P. 8(a)(2)). In deciding a motion to dismiss, a court must consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted)); *In re Bill of Lading*, 681 F.3d 1323, 1339 (Fed. Cir. 2012).

A claim has facial plausibility when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In considering the plausibility of a claim, courts must accept the plaintiff's factual allegations as true and construe all reasonable inferences in the plaintiff's favor. *Fowler v UPMC Shadyside*, 578 F.3d 203, 210 (3rd Cir. 2009). Thus, dismissal should only be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal citations omitted).

## B.     INDUCEMENT TO INFRINGE

Under 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." To establish inducement liability, a patentee must show "direct infringement [by another], and that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012).

In its complaint, a patentee need not "plead facts establishing that each element of an

asserted claim is met" or "even identify which claims it asserts are being infringed." *In re Bill of Lading*, 681 F.3d at 1335; *see also Mark IV Indus. Corp. v. Transcore, L.P.*, 2009 WL 4828661, *3-4, (D. Del. 2009). Rather, it need only plead facts sufficient to place the alleged infringer on notice as to what he must defend. *Twombly*, 550 U.S. at 565, fn10. In ANDA suits, inducement may be based on the proposed labeling of a drug that leads others to practice the claimed method. *See AstraZeneca LP v. Apotex Inc.*, 633 F.3d 1042, 1056-60 (Fed. Cir. 2010).

### C.    PATENTABLE SUBJECT MATTER UNDER SECTION 101

Patentable subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" (35 U.S.C. § 101), but does not include laws of nature, natural phenomena, and abstract ideas. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). As the Supreme Court has warned, however, "too broad an interpretation of this exclusionary principle could eviscerate patent law" since "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* Thus, "'a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm'" and "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 1293-94 (emphasis added); *see also Diamond v. Diehr*, 101 S. Ct. 1048, 1057 (1981). Recently, in *Alice Corp. Pty, Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014), the Supreme Court reiterated that "an invention is not rendered ineligible for patent simply because it involves an abstract concept," and that "'[a]pplication[s]' of such concepts 'to a new and useful end,' . . . remain eligible for patent protection." *Id.* (citation omitted).

In *Alice*, the Supreme Court articulated a two-part test for patent eligible subject matter. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts" - *i.e.* to a law of nature, natural phenomenon, or abstract idea. 134 S. Ct. at 2354. "To

answer that question, we consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'" *Id.* Step two is "a search for an 'inventive concept' - *i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* In carrying out this analysis, the claim must be considered as a whole. *Diehr*, 101 S. Ct. at 1057.

## II.     ENDO ADEQUATELY PLED ITS CLAIMS FOR INDUCED INFRINGEMENT

The allegations in the Complaint are sufficient to support Endo's claim that Actavis has induced and will induce infringement of the '737 Patent.  Actavis does not dispute that it is on notice of the specific acts that allegedly induce infringement, but instead argues that Endo's allegations are implausible because the Actavis Labels allegedly are insufficient to induce physicians or patients to carry out the steps in the '737 Patent claims.

Actavis is wrong.  They misconstrue the patent claims and ignore critical aspects of the Actavis Labels.  When properly construed and understood, it is clear that the Actavis Labels instruct physicians and patients to practice the claimed methods.  Thus, giving Endo the benefit of all reasonable inferences, as the Court must do for purposes of the motion to dismiss, those Labels confirm Endo's allegations that Actavis has and will induce infringement.

### A.      ENDO HAS GIVEN ACTAVIS ADEQUATE NOTICE OF WHAT IT MUST DEFEND

With respect to the CRF Tablets, Endo alleges that (a) the submission of Actavis's ANDA constitutes infringement under 35 U.S.C. § 271(e)(2)(A), and (b) any commercial sale of those Tablets before expiration of the '737 Patent "will constitute direct infringement, contributory infringement, and/or active inducement of infringement of the '737 Patent under 35 U.S.C. § 271 (a)-(c)."  Complaint at ¶¶ 42-44.  Similarly, with respect to the non-CRF Tablets, Endo alleges that Actavis's commercial sales of those Tablets infringe the '737 Patent under 35

U.S.C. § 271 (a)-(c)." *Id.* at ¶37. Moreover, Endo specifically alleges these actions have and will "induce physicians and patients to infringe the '737 Patent by performing all of the recited steps of one or more of claims 1-6 of the '737 Patent." *Id*. at ¶¶ 37, 44.

Thus, the Complaint identifies the specific infringing acts, the entity that actively induces infringement (Actavis), and the people it is inducing to infringe. Those allegations are sufficient to support Endo's induced infringement claim. See *In re Bill of Lading*, 681 F.3d at 1335 (a patentee need not "plead facts establishing that each element" of the claims is met or even "identify which claims it asserts are being infringed," and need only plead facts sufficient to place the alleged infringer on notice as to what he must defend).

**B. WHEN READ PROPERLY, IN THEIR ENTIRETY, THE ACTAVIS LABELS CONFIRM THE VIABILITY OF ENDO'S INDUCEMENT CLAIMS**

Actavis does not argue that Endo's allegations are deficient in putting it on notice of Endo's claims. Instead, Actavis looks outside the Complaint and argues that Endo's allegations lack the plausibility required under *Twombly* because the Actavis Labels do not adequately instruct physicians or patients to practice any of the claimed methods. Actavis Brf. (D.I. 12) at 7-9. However, Actavis ignores critical aspects of the Actavis Labels, and misreads others.

In particular, Actavis ignores the provisions it should have started with—the "Dosage and Administration" instructions of the first page of the Labels, which specifically instruct physicians to "*[r]educe the dose* of oxymorphone hydrochloride extended-release tablets in patients with mild hepatic impairment and *patients with renal impairment*." Actavis Ex. 3 at 1 (emphasis added). Those instructions are further confirmed in § 2.1 of the Labels (another section that Actavis ignores), which directs physicians to "[i]nitiate the dosing regimen for each patient individually, taking into account the patient's prior analgesic treatment experience," and in doing so, take into consideration the "[g]eneral condition and medical status of the patient." *Id.* at 4.

Moreover, § 2.6 instructs physicians to reduce the dosage of oxymorphone in renally impaired patients with creatinine clearance rates below 50 mL/min. *Id.* at 6-7. It also points them to § 8.7 which advises physicians that patients suffering from moderate to severe renal impairment have been shown to have an increase in oxymorphone bioavailability and reiterates the instruction to reduce the dosage of oxymorphone administered to such patients based on their measured creatinine clearance rate. *Id.* at 16 ("For patients on prior opioid therapy, ***start at 50% of the dose for a patient with normal renal function*** on prior opioids and titrate slowly").

Section 8.7 further points physicians to § 12.3, which provides specific bioavailability data (*i.e.*, how much of administered drug will actually be absorbed into the patient's bloodstream) for patients depending on degree of renal impairment. *Id.* at 23. The data is categorized according to creatinine clearance rates that directly mirror the ranges recited in the claims—*i.e.*, less than 30 mL/min, between 30 and 50 mL/min, between 51 and 80 mL/min, and above 80 mL/min. It shows that the bioavailability of the oxymorphone increases (*i.e.*, more of the oxymorphone gets into a patient's bloodstream) as the severity of the renal impairment increases. In view of that data, a physician would understand that she needs to reduce the dosage for renally impaired patients based on the degree of severity of impairment, because the more severe the impairment, the higher the amount of oxymorphone that will be absorbed into the patient's bloodstream—oxymorphone is a potent opioid and ingesting too much can lead to significant adverse side effects, including potentially fatal overdoses. *See Id.* at 3.

Thus, the Actavis Labels are likely to induce physicians and/or patients to infringe. In particular, in treating renally impaired patients for pain, physicians and/or patients will (b) "provide" the oxymorphone tablets described in the Labels (*i.e.*, perform step "a." of the claims), (b) assess the degree of renal impairment by "measuring" the patient's creatinine clearance level in view of the pharmacokinetic data in § 12.3 (*i.e.*, perform step "b."), and (c) thereafter

"administer" a lower dosage of oxymorphone as warranted by the measured creatinine clearance value in view of the specific dosing instructions in the Labels. (*i.e.*, perform step "c.").

*AstraZeneca v. Apotex*, 633 F.3d at 1056-60, is instructive. There, the Federal Circuit held that a generic's proposed label evidenced its affirmative intent to induce infringement. The claims were directed to once daily dosing, and the label recommended starting with twice daily administration, but noted that patients should "'titrate down' to the lowest effective dose of the medication to avoid any adverse effects from excessive use of the medication." *Id.* at 1047. The Federal Circuit rejected the generic's argument that "warnings on drug labels do not influence how a drug is used," and held that "the downward–titration language" "would inevitably lead some consumers to practice the claimed method." *Id.* at 1051, 1060. The same is true here.[8]

## C. THE CASES ON WHICH ACTAVIS RELIES ARE INAPPOSITE

The cases on which Actavis relies for its arguments that the Actavis Labels render Endo's claims implausible are inapposite. In particular, Actavis cites cases holding that a generic can only infringe method of treatment claims under § 271(e)(2) if its ANDA seeks approval to market the drug for the particular use recited in the asserted patent claims. *See, e.g.,* Actavis Brf. (D.I. 12) at 7-8. While that proposition is true, those cases are readily distinguishable because in each instance, the accused infringer was seeking FDA approval to market its generic drug to treat an indication that was different than the method of use claimed in the patent.

In *AstraZeneca Pharms. LP v. Apotex Corp.*, 669 F.3d 1370, 1379 (Fed. Cir. 2012), for example, the patents claimed methods of using rosuvastatin for two very specific purposes—to

---

[8] Actavis's brief includes cursory assertions that Endo's allegations concerning the existing sales of its CRF Tablets are inadequate, but does not assert that any particular element of a claim for inducement to infringe is inadequately pled. *See* Actavis Brf. at 8-9. To the extent Actavis asserts any basis in its reply brief for dismissing Endo's claims other than the implausibility argument addressed above, Endo respectfully requests that it be given an opportunity to amend its Complaint to address such deficiency (*see* Argument II.D. below) and/or to file a sur-reply brief responding to such allegations.

treat heterozygous familial hypercholesterolemia ("HeFH") and to lower cardiovascular disease risk for individuals with elevated circulating C-reactive protein ("CRP"). The Court dismissed the patentee's infringement claims because the generic's ANDA sought approval to market the drug for different uses, and specifically carved out from the proposed label any indications directed toward treating HeFH or elevated CRP. 669 F.3d at 1373-74, 1379. Similarly, in *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1354-55 (Fed. Cir. 2003), the court granted summary judgment of no infringement under § 271(e)(2) because the generic's ANDA did not seek approval to sell the drug for treatment of neurodegenerative diseases, which was the only use covered by the patent at issue in that case (instead, it sought approval for the treatment of epilepsy). 316 F.3d at 1362; *see also Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1321-24 (Fed. Cir. 2012).

Here, by contrast, Actavis's ANDA seeks FDA approval "for the relief of moderate to severe pain" (*see* Actavis Ex. 3 at 1), which is the same indication claimed by the '737 Patent (claim 1: "method of treating pain"). Moreover, the Actavis Labels even include very specific directions instructing physicians how to treat the particular patient population recited in the claims of the '737 Patent (*i.e.*, "renally impaired patients"). *See* discussion *supra*.

Thus, the cases that Actavis cites provide strong support for sustaining Endo's infringement claims, rather than dismissing them.[9] *See also, e.g., Novartis Pharms. Corp. v. Actavis, Inc.*, 2012 WL 6212619 (D. Del 2012) (distinguishing *Bayer* and denying Actavis's motion for judgment on the pleadings where the issue of whether ANDA sought approval to market the drug product for a patented use depended upon how that claim was to be construed).

---

[9] Furthermore, the cases Actavis cites, even if applicable, would only go to Endo's claims vis-à-vis Actavis's CRF Tablets, which have not yet been approved by FDA, and would not apply to Endo's claims that Actavis's actual sales of its non-CRF Tablets is actively inducing physicians and patients to infringe the '737 Patent.

At best for Actavis, the issue of whether Actavis is inducing others to infringe the '737 Patent is a fact issue that will be the subject of fact and/or expert discovery in this case. Accordingly, dismissal of that claim would be improper at this stage of the proceedings.

### D. EVEN IF THE COURT WERE TO FIND THAT ENDO'S CLAIMS ARE INADEQUATELY PLED, THE PROPER REMEDY WOULD BE TO GRANT LEAVE TO FILE AN AMENDED COMPLAINT

Courts "should freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a)(2). Thus, the Third Circuit has adopted a liberal approach to the amendment of pleadings "to ensure that a particular claim will be decided on the merits rather than on technicalities." *Abbott Labs. v. Johnson and Johnson, Inc.,* 524 F.Supp.2d 553, 557 (D.Del. 2007) (quoting *Dole v. Arco Chem. Co*., 921 F.2d 484, 486–87 (3d Cir.1990)). Leave to amend should generally be granted absent a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Accordingly, should the court decide that Endo's claims for infringement of the '737 Patent are inadequately pled, the proper remedy would be for the Court to grant Endo the opportunity to amend its Complaint to remedy any perceived deficiencies.

## III. THE '737 PATENT IS NOT INVALID FOR CLAIMING UNPATENTABLE SUBJECT MATTER

Actavis's fall-back argument is that Endo's claims for infringement of the '737 Patent should be dismissed because they allegedly are directed to unpatentable subject matter and hence invalid under 35 U.S.C. § 101. Actavis Brf. (D.I. 12) at 9-12. Actavis is wrong, both on the merits (because the claimed inventions are directed to methods of treating a medical condition, which is clearly patentable subject matter) and because at best for Actavis, its motion is

premature in view of the fact that no discovery has been conducted and no claim construction ruling has been made.

A. **THE '737 PATENT IS DIRECTED TO PATENTABLE SUBJECT MATTER— METHODS OF USING A PARTICULAR DRUG TO TREAT A SPECIFIC MEDICAL CONDITION IN A SPECIFIC PATIENT POPULATION**

The '737 Patent is directed to patentable subject matter—methods of using a particular drug to treat a specific medical condition in a specific patient population. Actavis does not cite any case that invalidates any method of treatment claim as being directed to ineligible subject matter, and as far as Endo can tell, no such case exists.

While laws of nature, natural phenomena, and abstract ideas are not patentable in and of themselves, the Supreme Court has recognized that "too broad an interpretation of this exclusionary principle could eviscerate patent law" because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id*. *Mayo*, 132 S. Ct. at 1293. Accordingly, "'a process is not unpatentable simply because it contains a law of nature or a mathematical algorithm,'" and "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 1293-94 (italics in original), citing *Diehr*, 450 U.S. at 187. In *Diehr,* for example, the Court held that "Arrhenius' equation is not patentable in isolation, but when a process for curing rubber is devised which incorporates in it a more efficient solution of the equation, that process is at the very least not barred at the threshold by § 101."

Here, while it is true that the claimed inventions relate to the unexpected discovery that the bioavailability of oxymorphone is increased in patients with renal impairment, the claims are not directed to that scientific discovery itself; rather, they are directed to a novel and useful application of that discovery—*i.e.*, to the treatment of renally impaired patients by administering a lower dose of oxymorphone based upon the severity of the renal impairment. In accordance

14

with *Classen Immunotherapies, Inc. v. Biogen Idec*, 659 F.3d 1057 (Fed. Cir. 2011) ("*Classen I*"), those claims are patent eligible. Nothing in *Mayo* alters that conclusion, and applying the two-part test articulated in *Alice* confirms the patentability of those claims.

### 1. *Classen* Compels the Conclusion that the Claims at Issue Are Patent Eligible

The distinction between a pharmaceutical patent claim that is merely directed to a natural law itself, and a claim (like the method of treatment claims at issue here) that is directed to a novel application of that natural law was at the heart of the Federal Circuit's decision in *Classen*, which is directly on point and compels the conclusion that the claims at issue are patent eligible.

In *Classen*, the court contrasted claims from three patents, all of which related to methods of lowering the risk of chronic immune-mediated disorder. Specifically, the patents related to the discovery that the schedule of infant immunization for infectious diseases can affect the later occurrence of chronic immune-mediated disorders, and that immunizations should be conducted on the schedule that presents the lowest risk with respect to such disorders. *Id*. at 1060. Two of the patents contained claims that included the steps of "screening" and "comparing" information on immunization schedules to identify the lower risk schedule, and then "*immunizing*" the patient, such that the vaccine is "*administered*" in accordance with that lower risk schedule. *Id*. at 1060 (italics added). The third patent, by contrast, was directed to a "method of determining" whether an immunization schedule affects the incidence or severity of chronic immune-mediated disorders by "comparing" the incidence of such disorders between a treatment and control group that have been immunized with the vaccine. *Id*. at 1061.

The Federal Circuit held that the first two patents' claims were patent eligible, while the third patent's claims were not. *Id*. at 1066-69. The difference being that the "immunizing" step of the claims in the first two patents included practical use of the scientific knowledge (actually

immunizing subjects by administering a vaccine in accordance with the lower-risk schedule), "thus moving from abstract scientific principle to specific application," while the claims of the third patent were "directed to the abstract principle that variation in immunization schedules may have consequences," without "any movement from principle to application." *Id.* at 1067-69.

Here, the claims of the '737 Patent are directed to the specific application of scientific knowledge for a particular practical use. The claims do not stop at requiring that creatinine clearance levels of renally impaired patients be measured, or merely require that the results of such tests be assessed; rather, they include the specific step of "administering" to the patient "a lower dose" of the controlled release oxymorphone tablets in order to "provide pain relief." Thus, under *Classen*, they fall squarely on the side of patent eligible subject matter.

## 2. *Mayo* Does Not Dictate a Different Conclusion

Nothing in *Mayo* compels a different conclusion. To the contrary, like the third patent at issue in *Classen*, the *Mayo* patent claims merely required the gathering and assessment of scientific data, without any step actually implementing a practical application based on that data. In particular, the *Mayo* patent claims merely required "determining" the level of a certain metabolite (6-thioguanine) in a subject following administration of a thiopurine drug, and then evaluating that data with the recognition that an amount less than a specified low-end threshold "indicates a need to increase the amount of said drug subsequently administered to said subject," while the presence of the metabolite above a specified upper level "indicates a need to decrease the amount of said drug subsequently administered to said subject." In other words, the claims did not require that anyone actually do anything with the data obtained via the "determining" step, other than recognize the law of nature itself (*i.e.,* "the relationship[] between the concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm"). *Mayo*, 132 S. Ct. at 1296. For instance, they did

not require the physician or patient to change the dose based upon that knowledge. Thus, as with the third patent's claims in *Classen*, there was nothing in the *Mayo* patent claims to move them from abstract scientific principle to specific application.

Actavis attempts to equate the '737 claims with the *Mayo* claims by noting that they both include an "administering" step. That superficial argument fails, however, because Actavis ignores the very different roles that the "administering" steps have in the two sets of patent claims. In the *Mayo* claims, the thiopurine drug had to first be administered to the patient in order for the blood levels of the metabolite to thereafter be measured via the "determining" step. As the Supreme Court explained, the claimed method steps in *Mayo* "simply tell doctors to gather data from which they *may* draw an inference in light of the correlations" (*id.* at 1298 (emphasis added)), and the "administering" step merely provided the data which the physician was then supposed to use in "determining" whether the concentration of the metabolite in the patient's blood was within, below, or above the desired concentration range. That is what the *Mayo* Court meant when it said that "the 'administering' step simply refers to the relevant audience." 132 S. Ct. at 1297.

Here, by contrast, the "administering" step of the '737 Patent claims plays a very different role: administering a lower dose of controlled release oxymorphone to a renally impaired patient based upon the degree of severity of the impairment, to provide safe and effective pain relief to such a patient. This is a new and useful application of the scientific discovery that provides therapeutic benefits to patients. Thus, it is not a mere diagnostic step used for data-gathering purposes, as in *Mayo*, but rather is the very step that, in the words of § 101, embodies the "new and useful process" that is the heart of the claimed invention.

*Classen Immunotherapies, Inc. v. Biogen IDEC*, 2012 WL 3264941 (D. Md. 2012) (*Classen II*), is instructive. On remand following the Federal Court's decision in *Classen I*, the

defendant moved to dismiss the two patents upheld in *Classen I* in view of the Supreme Court's subsequent *Mayo* decision. The court denied that motion, reasoning that:

> The patents at issue here include the mandatory application step that was missing in the *[Mayo v.] Prometheus* claims. *Prometheus II*, 132 S. Ct. at 1296–97. Rather than "at most" suggesting a general course of action after the data-gathering step, *id.,* the Classen claims require immunizing according to a particular schedule in *addition* to the data-gathering step.

2012 WL 3264941 at *5. The same is true here, where the claims require administering a lower dose of oxymorphone based on the severity of renal impairment, *in addition to* the gathering of creatinine clearance data via the "measuring" step, and thereby include the mandatory application step missing in *Mayo*. *See also Alice*, 134 S. Ct. at 2354 (the "application" of abstract concepts to "'a new and useful end,' . . . remain eligible for patent protection").

The other cases that Actavis cites - *Genetic Techs., Ltd. v. Lab. Corp. of Am. Holdings, Inc.*, 2014 WL 4379587 (D. Del. 2014), and *Genetic Techs., Ltd. v. Bristol-Myers Squibb Co.*, 2014 WL 5507637 (D. Del. 2014)—are of no help to it. In both instances, the method claims at issue were similar to the *Mayo* claims in that they lacked any actual implementation step that transformed the claims from abstract scientific principles to a specific practical application of such principles. In *Lab. Corp.*, the claims were directed to a correlation between a particular genetic variation and athletic performance, and amounted to "simply stating out loud that the person will have relatively greater sprinting, strength or power performance due to the presence of the genetic variation," without any step requiring the practical application of that correlation "'*to a new and useful end*.'" 2014 WL 4379587, *12-13 (italics in original) (citing *Mayo*, 132 S. Ct. at 1294). Similarly, in *Bristol-Myers*, the claims merely recited the steps of "amplifying" certain DNA sequences and then "analyzing" them to detect genetic variation, and lacked any new or useful practical application of that detection or analysis. 2014 WL 5507637, *9-12.

### 3. Applying the *Alice* Two-Part Test Confirms the Patentability of the Claims at Issue

Applying the *Alice* two-part test confirms the patentability of the claims at issue. The first *Alice* step is to determine whether the claims are directed to a patent ineligible concept. *Alice*, 134 S. Ct. at 2354. For the reasons articulated above, they are not. Actavis argues that the claims are directed to a "natural law: the bioavailability of oxymorphone is increased in patients with renal impairment" (Actavis Brf. (D.I. 12) at 11), but as just explained, that is not what is claimed. Instead, what is claimed is a method of treating pain in renally impaired patients by decreasing the dosage of oxymorphone based upon the severity of their impairment so as to provide safe and effective pain relief. Thus, considering the limitations of each claim as a whole ("as an ordered combination"), and in particular the "administering" step discussed in detail above, it is evident that the claims are not directed to the alleged natural law itself (the increased bioavailability of oxymorphone in renally impaired patients), but to a new and useful application of that knowledge which provides actual therapeutic benefits to a specified patient population.

To hold otherwise would invalidate all method of treatment claims, because all medical treatments are based on effects that a drug or medical procedure will have on the body, which necessarily is the result of natural laws and phenomena. Similarly, the discovery of a new use for an existing compound or other thing would no longer be patentable, because the benefits of that new use will always be the result of natural laws or phenomena—whether the laws of biology and chemistry in the case of new pharmaceutical uses, or the laws of physics in the case of new mechanical uses. Actavis's argument goes too far.

Accordingly, the Court should not even get to *Alice* step two - because the claims are not directed to a patent ineligible concept, the Court's inquiry should stop after step one. But even if the Court were to continue, the '737 Patent claims withstand scrutiny under step two as well. In

particular, for the reasons articulated above, those claims include additional features that reflect an "inventive concept" and supply a new and useful application of any natural law on which the claimed methods are based. In particular, the claims are directed to an improvement in the use of oxymorphone to treat pain - *i.e.*, the use of a modified treatment regimen for a specific patient population so as to ensure that those patients obtain safe and effective pain relief.

Actavis undoubtedly will challenge the novelty and nonobviousness of that modified treatment regimen, but those issues go to the patentability of the claimed inventions under 35 U.S.C. §§ 102 and 103, not their eligibility for patent protection under § 101. In any event, even if the Court were to determine that the novelty and/or obviousness of administering a reduced dose of oxymorphone based upon the severity of a patient's renal impairment also goes to patent eligibility, there is *no evidence* in the record that the claimed invention was already "well known in the art" or involved merely "conventional steps." That oxymorphone was already available and used to treat pain (*see* Actavis Brf. (D.I. 12) at 12) in no way indicates that the treatment regimen for renally-impaired patients, as per the '737 Patent claims, was known or conventional.

Accordingly, there is no basis on which the Court could invalidate the '737 Patent at this stage, because at best for Actavis, the above issues would raise disputed questions of fact that cannot be resolved on a motion to dismiss. *See, e.g., Ultramercial, Inc. v. Hulu*, LLC, 722 F.3d 1335, 1339 (Fed. Cir. 2013) (to invalidate a patent on subject matter ineligibility grounds at the pleading stage, "the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility") (emphasis in original), *vacated on other grounds, WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014); *see also InvestPic, LLC v. FactSet Research Sys.*, 2011 WL 4591078, at *1-2 (D. Del. 2011).

## CONCLUSION

For all of the foregoing reasons, the Court should deny Actavis's motion to dismiss.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*

_____
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Jonathan D. Loeb
DECHERT LLP
2440 W. El Camino Real, Suite 700
Mountain View, CA 94040
(650) 813-4800

Martin J. Black
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Robert D. Rhoad
Brian M. Goldberg
DECHERT LLP
902 Carnegie Center, Suite 500
Princeton, NJ 08540
(609) 955-3200

*Attorneys for Endo Pharmaceuticals Inc.*

Jeffrey J. Toney
Marcus A. Barber
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
(650) 453-5170

Rodney R. Miller
Paul G. Williams
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1349 W. Peachtree Street, N.W., Suite 1500
Atlanta, GA 30309
(404) 260-6080
*Attorneys for Mallinckrodt LLC*
February 27, 2015

8930644

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2015, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused to be served copies of the foregoing document on February 27, 2015, upon the following in the manner indicated:

| | |
|---|---|
| Adam W. Poff | *BY ELECTRONIC MAIL* |
| Robert M. Vrana | |
| YOUNG CONAWAY STARGATT & TAYLOR | |
| 1000 North King Street | |
| Wilmington, DE 19801 | |
| *Attorneys for Defendants Actavis Inc. and Actavis South Atlantic LLC* | |
| | |
| Charles Weiss | *BY ELECTRONIC MAIL* |
| HOLLAND & KNIGHT LLP | |
| 31 West 52nd Street | |
| New York, NY 10019 | |
| *Attorneys for Defendants Actavis Inc. and Actavis South Atlantic LLC* | |

*/s/ Julia Heaney*

_____

Julia Heaney (#3052)