IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ENDO PHARMACEUTICALS INC. and MALLINCKRODT LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 14-1381 (RGA) (MPT) ) |
| ACTAVIS INC. and ACTAVIS SOUTH ATLANTIC LLC, | ) ) ) |
| Defendants. | ) |

**ENDO'S OBJECTIONS TO THE REPORT AND RECOMMENDATION
REGARDING DISMISSAL UNDER 35 U.S.C. § 101**

OF COUNSEL:

Jonathan D. Loeb
DECHERT LLP
2440 West El Camino Real, Suite 700
Mountain View, CA 94040
(650) 813-4800

Martin J. Black
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

Robert D. Rhoad
DECHERT LLP
902 Carnegie Center, Suite 500
Princeton, NJ 08540
(609) 955-3200

*Attorneys for Endo Pharmaceuticals Inc.*

October 13, 2015

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| I. | BACKGROUND | | 1 |
| II. | STANDARD OF REVIEW | | 2 |
| III. | OBJECTIONS | | 2 |
| | 1. | The R&R incorrectly concluded that the '737 Patent's claims are directed to a law of nature rather than a new and useful regimen for treating pain in a specific patient population | 3 |
| | | A  The R&R incorrectly found that the '737 Patent's claims were "highly analogous" to the patent claims found invalid in *Mayo v. Prometheus*. | 4 |
| | | B.  The R&R failed to correctly apply the Federal Circuit's *Classen* decision | 6 |
| | | C.  The R&R improperly found that the '737 Patent claims would unduly preempt future inventions and discoveries in this field | 9 |
| | 2. | The R&R's reasoning, if adopted, would invalidate many method-of-treatment claims that use an existing, well-known compound | 9 |
| IV. | CONCLUSION | | 10 |

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) ......................................................................................... 7

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
   2012 WL 3264941 (D. Md. 2012) ........................................................................ 7

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
   659 F.3d 1057 (Fed. Cir. 2011) ..................................................................... passim

*Diamond v. Diehr*,
   101 S. Ct. 1048 (1981) ......................................................................................... 2

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) ................................................................................. passim

**STATUTES**

28 U.S.C. § 636 ............................................................................................................ 2

35 U.S.C. § 101 .................................................................................................... passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 72(b) .................................................................................................... 2

Endo's U.S. Patent No. 8,808,737 (the "'737 Patent") is directed to a method of using controlled release oxymorphone to treat a specific medical condition—*pain*—in a specific patient population—*renally impaired patients*—in a new, useful way—*lowering the dosage in dependence on the creatinine clearance rate*. Although Endo's claimed invention in some sense relies upon the laws of nature (natural laws dictate the ways in which oxymorphone works to relieve patients' pain), that is true for virtually all inventions relating to the pharmaceutical sciences and does not render that invention patent ineligible under applicable Supreme Court and Federal Circuit case law. Yet Judge Thynge's Report and Recommendation ("R&R") (D.I. 51) found the '737 claims to be directed to patent-ineligible subject matter under 35 U.S.C. § 101. In doing so, the R&R misapprehended the '737 claims and incorrectly applied the teachings of the '737 Patent as if they were prior art. Based on these errors, the R&R failed to correctly apply a dispositive Federal Circuit decision upholding the patent eligibility of similar claims under § 101, and instead drew a strained analogy to patent claims that the Supreme Court found patent ineligible.

The R&R's reasoning is so overbroad that if its reasoning were adopted in other cases, it would invalidate a large number of method-of-treatment claims—a result with no basis in statute or case law. The Court should not allow the law-of-nature exception to patent eligibility under § 101 swallow up patent eligibility for method-of-treatment claims. Rather, the Court should reject the R&R and deny Actavis's motion to dismiss.

## I.     BACKGROUND

Actavis, alone among the seven defendant groups, filed a motion to dismiss Plaintiffs' claims for infringement of the '737 Patent (one of two patents-in-suit) on two grounds: (1) that Endo cannot prove that Actavis has or will induce infringement of the '737 Patent; and (2) that the '737 Patent's claims are not patent eligible under 35 U.S.C. § 101. The R&R accepted

Actavis's second argument and recommends that the Court find that the '737 Patent's claims are not patent eligible under § 101. In view thereof, the R&R declined to address the adequacy of Endo's claims of induced infringement.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 72(b), the Court reviews a party's timely objections to a Magistrate Judge's dispositive recommendation *de novo*. The Court may "accept, reject, or modify" the Magistrate Judge's recommendation. *Id.*; *see also* 28 U.S.C. § 636.

## III. OBJECTIONS

Section 101 of the Patent Act broadly defines patentable as including "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof. 35 U.S.C. § 101. Courts nevertheless have recognized an exception thereto: that laws of nature, natural phenomena, and abstract ideas are not patentable. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). Importantly, however, the Supreme Court has repeatedly warned that "too broad an interpretation of this exclusionary principle could eviscerate patent law" because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature." *Id*. Thus, "a process is not unpatentable simply because it contains a law of nature" and "an *application* of a law of nature . . . to a known structure or process may well be deserving of patent protection." *Id.* at 1293–94 (emphasis in original); *see also Diamond v. Diehr*, 101 S. Ct. 1048, 1057 (1981).

Here the R&R does exactly what the Supreme Court warned against in *Mayo*: it expands the law-of-nature exception to patent eligibility too far and recommends invalidating a patented invention that applies a law of nature in a new and useful way. Accordingly, the Court should reject the recommendations of the R&R and deny Actavis's motion.

2

**1. THE R&R INCORRECTLY CONCLUDED THAT THE '737 PATENT'S CLAIMS ARE DIRECTED TO A LAW OF NATURE RATHER THAN A NEW AND USEFUL REGIMEN FOR TREATING PAIN IN A SPECIFIC PATIENT POPULATION.**

The '737 Patent is directed to methods of treating pain with a particular drug (oxymorphone) in a particular patient population (renally impaired patients) by using a particular treatment regimen that is different than is used for patients with normal renal function. Representative claim 1 recites:

> A method of treating pain in a renally impaired patient, comprising the steps of:
> a. providing a solid oral controlled release dosage form, comprising:
>    i. about 5 mg to about 80 mg of oxymorphone or a pharmaceutically acceptable salt thereof as the sole active ingredient; and
>    ii. a controlled release matrix;
> b. measuring a creatinine clearance rate of the patient and determining it to be (a) less than about 30 ml/min, (b) about 30 mL/min to about 50 mL/min, (c) about 51 mL/min to about 80 mL/min, or (d) above about 80 mL/min; and
> c. orally administering to said patient, in dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief;
> wherein after said administration to said patient, the average AUC of oxymorphone over a 12-hour period is less than about 21 ng·hr/mL.

Thus, the claimed methods include the steps of: (a) providing a controlled release dosage form of oxymorphone; (b) measuring a patient's creatinine clearance rate (which is a measure of the degree of a patient's renal insufficiency, *see* '737 Patent col.36 ll.28–29); and (c) administering to the patient, depending on the severity of the renal impairment as measured by the patient's creatinine clearance rate, a lower dosage of the oxymorphone dosage form to provide pain relief.

As Endo demonstrated in its opposition to Actavis's motion, the claimed method is not directed to any law of nature itself, but is instead directed to a new and useful process (the altered treatment regimen) that provides a practical, tangible benefit (relief of pain) in a particular patient population. The R&R misapprehended the significance of the administering step, stating: "The administering step merely instructs physicians to dispense oxymorphone for

3

the treatment of pain in a well-know [sic] manner, while utilizing the natural law to manage the dosage." R&R at 16. The support for this conclusion is both irrelevant and incorrect. The R&R first commented that "use of oxymorphone for pain relief is a well-understood activity," but the fact that oxymorphone treatment for the general patient population was known has no bearing on the claimed method of treating the particular patient population that is the subject of Endo's invention. Citing the patent specification, the R&R also made the irrelevant observation that "kidney impairment is not rare" and erroneously stated that "nor is the relationship between renal impairment and this drug unknown." There is no evidence of record that *before* Endo's invention, anyone knew anything about how renally impaired patients' bodies would react to the administration of controlled release oxymorphone tablets, let alone that it was known how controlled release oxymorphone could be safely and effectively administered to renally impaired patients or that that particular patient population could be beneficially treated by reducing the dosage of oxymorphone administered in dependence on such a patient's creatinine clearance rate.

### A. The R&R incorrectly found that the '737 Patent's claims were "highly analogous" to the patent claims found invalid in *Mayo v. Prometheus*.

The R&R noted that "[t]he facts in *Mayo* are highly analogous to the facts in the instant matter." R&R at 10, 15. But unlike the '737 claims at issue, the *Mayo* patent claims merely required the gathering and assessment of scientific data, without any step actually implementing a practical application based on that data. In particular, the *Mayo* patent claims merely required "determining" the level of a certain metabolite (6-thioguanine) in a subject following administration of a thiopurine drug, and then evaluating that data and recognizing that an amount less than a specified low-end threshold "indicates a need to increase the amount of said drug subsequently administered to said subject," while the presence of the metabolite above a

4

specified upper level "indicates a need to decrease the amount of said drug subsequently administered to said subject." In other words, the claims did not require that anyone actually do anything with the data obtained via the "determining" step, other than recognize the law of nature itself (*i.e.*, the "relationship[] between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm"). *Mayo*, 132 S. Ct. at 1296. Critically, the *Mayo* claims did not require the physician or patient to change the dose based upon that knowledge or otherwise *apply* that knowledge in any practical, tangible way. Thus, there was nothing in those claims to move them from abstract scientific principle to specific application.

Although the *Mayo* and '737 Patent claims both include an "administering" step, those "administering" steps are not at all "highly analogous" to each other. In the *Mayo* claims, the thiopurine drug had to first be administered to the patient in order for the blood levels of the metabolite to thereafter be measured via the "determining" step. As the Supreme Court explained, the claimed method steps in *Mayo* "simply tell doctors to gather data from which they *may* draw an inference in light of the correlations" (*id.* at 1298 (emphasis added)), and the "administering" step merely provided the data that the physician was then supposed to use in "determining" whether the concentration of the metabolite in the patient's blood was within, below, or above the desired concentration range. Here, by contrast, the "administering" step of the '737 Patent claims does more than simply refer to the relevant audience—it actually requires administration of a lower dose of oxymorphone to a renally impaired patient based upon the degree of severity of the impairment to provide safe and effective pain relief. This practical, tangible action step thus reflects a new and useful application of the scientific discovery that provides therapeutic benefits to renally impaired patients. Thus, it is not a mere diagnostic step

5

used for data-gathering purposes, as in *Mayo*, but rather is the very step that, in the words of § 101, embodies the "new and useful process" that is the heart of the claimed invention.

### B. The R&R failed to correctly apply the Federal Circuit's *Classen* decision.

The Federal Circuit's decision in *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057 (Fed. Cir. 2011), is on-point and dispositive. In *Classen*, the Federal Circuit distinguished between a pharmaceutical patent claim that is merely directed to a natural law itself, and a claim (like the method-of-treatment claims at issue here) that applies that natural law in a new and useful way. The *Classen* court analyzed three patents, all of which related to methods of lowering the risk of chronic immune-mediated disorder. Two of the patents contained claims that included the steps of "screening" and "comparing" information on immunization schedules to identify the lower risk schedule, and then "immunizing" the patient, such that the vaccine is "administered" in accordance with that lower risk schedule. *Id.* at 1060. The third patent, by contrast, was directed to a "method of determining" whether an immunization schedule affects the incidence or severity of chronic immune-mediated disorders by "comparing" the incidence of such disorders between a treatment and control group that have been immunized with the vaccine, and involved no administration step. *Id.* at 1061.

The Federal Circuit held that the claims of the first two patents were patent eligible under § 101, while the claims of the third patent were not. *Id.* at 1066–69. The first two patents' claims included a practical application of scientific knowledge (*i.e.*, actually "immunizing" subjects by "administering" a vaccine in accordance with the lower risk schedule), "thus moving from abstract scientific principle to specific application," while the claims of the third patent were "directed to the abstract principle that variation in immunization schedules may have consequences," without "any movement from principle to application." *Id.* at 1067–69.

6

On remand after *Mayo*, the *Classen* district court again analyzed the first two patents, applied *Mayo*, and found them to be patent eligible under § 101. *See Classen Immunotherapies, Inc. v. Biogen IDEC*, 2012 WL 3264941 (D. Md. 2012). As the court explained:

> The patents at issue here include the **mandatory application** step that was missing in the [*Mayo v.*] *Prometheus* claims. *Prometheus II,* 132 S. Ct. at 1296–97. Rather than "at most" suggesting a general course of action after the data-gathering step, *id.*, the Classen claims require immunizing according to a particular schedule in *addition* to the data-gathering step.

2012 WL 3264941, at *5 (emphasis added).

Here, like the first two patents in *Classen*, the claims of the '737 Patent include the mandatory application step missing in *Mayo*: they are directed to the specific application of scientific knowledge for a particular practical use. The '737 Patent's claims do not stop at requiring that creatinine clearance levels of renally impaired patients be measured, or merely require that the results of such tests be assessed; rather, they include the specific step of "administering" to the patient "a lower dose" of the controlled release oxymorphone tablets in order to "provide pain relief." Thus, under *Classen* and *Mayo*, they are patent eligible under § 101. *See also Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (the "application" of abstract concepts to "'a new and useful end,' . . . remain eligible for patent protection").

The R&R cites *Classen* but fails to distinguish between patent-ineligible claims that merely recite natural laws and patent-eligible claims that apply them in new and useful ways. For example, the R&R conflates the two in a single sentence: "The administering step [of the '737 Patent's claims] merely instructs physicians to dispense oxymorphone for the treatment of pain in a well-know[n] manner, *while utilizing the natural law to manage the dosage*." R&R at 16 (emphasis added). The '737 Patent's method of "utilizing the natural law to manage the

7

dosage"—*i.e.*, by administering to the patient, depending on the severity of the renal impairment as measured by the patient's creatinine clearance rate, a lower dosage of the controlled release oxymorphone dosage form to provide pain relief—was not "well-known" and is just the sort of patentable application of a natural law foreseen by *Mayo* and found in *Classen*.

In this way, the R&R loses sight of the '737 Patent's claimed method that applies a natural law in new and useful way. As another example, the R&R states:

> Unlike *Classen*, the '737 Patent recognizes the use of oxymorphone for pain relief is a well-understood activity. The '737 Patent further acknowledges that kidney impairment is not rare, nor is the relationship between renal impairment and this drug unknown.

R&R at 16–17. But this misses both the point of *Classen* and the '737 Patent's claimed method. Although the use of oxymorphone for pain relief in the general population was known, there is no evidence in the record suggesting that the '737 Patent's claimed method of treatment for renally impaired patients with controlled release oxymorphone was understood by anyone. The patent specification passage cited for this point in the R&R—which of course cannot be considered prior art against the patent claims—merely says "[i]mpaired kidney function results in a *potential* build up of substances that are typically filtered out by the kidneys, such as . . . *some drugs*," not that it was known that the bioavailability of controlled release oxymorphone is affected by renal function or that renally impaired patients could or should be treated safely and effectively by administering to them a reduced the dosage of controlled release oxymorphone. R&R at 17, n.94 (quoting '737 Patent col.2 ll.18–25) (emphasis added). The same was true for the patent-eligible *Classen* patent claims. *See* R&R at 16 (discussing *Classen*; "The [*Classen*] court explained it could not conclude Classen's patent claims involved routine activity because there was 'no information in the record' to support that conclusion."). And, like *Classen*'s patent-eligible claims, the '737 Patent includes a specific, new, and useful step that applies a

8

natural law and moves the '737 Patent's claims "from abstract scientific principle to specific application." *See Classen*, 659 F.3d at 1067–69.

### C. The R&R improperly found that the '737 Patent claims would unduly preempt future inventions and discoveries in this field.

The R&R further erred by relying upon general statements from the specification of the '737 Patent in concluding that the '737 Patent would unduly "preempt future inventions and discoveries in this field." R&R at 17. As a threshold matter, it was error to cite such statements from the specification, rather than evaluating the claims themselves, as it is the claims that define the scope of the claimed invention. Moreover, as a substantive matter, the claims of the '737 Patent are not unduly preemptive—they are limited to a specific method of treating a very particular patient population (renally impaired patients) using a very particular drug (controlled release oxymorphone) in a very particular way (reducing the dosage in dependent upon the patients' creatinine clearance rate). They do not purport to cover all methods of treating pain in renally impaired patients (such as by administering an alternative medication that is either unaffected or less affected by renal deficiencies, or by using acupuncture or another non-medical pain therapy); nor do they purport to cover any other conceivable methods of treating such patients with controlled release oxymorphone (such as, among other alternatives, by altering the amount of oxymorphone absorbed into the bloodstream in some way other than reducing the dose). Thus, the '737 Patent does not run afoul of the concern expressed in *Mayo* and other cases that patents "not inhibit further discovery by improperly tying up the future use of laws of nature." *See Mayo*, 132 S. Ct. at 1301 (cited in R&R at 17).

### 2. THE R&R'S REASONING, IF ADOPTED, WOULD INVALIDATE MANY METHOD-OF-TREATMENT CLAIMS THAT USE AN EXISTING, WELL-KNOWN COMPOUND.

The R&R notes that the '737 Patent's claims merely "utiliz[e] the natural law to manage the dosage." *See* R&R at 16. But all pharmaceutical method-of-treatment patents use natural

9

laws and phenomena (the way patients' bodies react to and process drug products) to achieve a desired result. As the Supreme Court warned in *Mayo*, "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." 132 S. Ct. at 1293. Under the R&R's reasoning, the discovery of a new method of medical treatment of patients using an existing, well-known compound would no longer be patent eligible under § 101 because the benefits of that new method will always be the result of applying natural laws or phenomena. The R&R observes how the '737 Patent's claims use of a law of nature—*i.e.*, the claims "utiliz[e] the natural law to manage the dosage," *see* R&R at 16—but, instead of heeding *Mayo*'s warning, the R&R used that observation to find the claims patent ineligible.

The R&R's reasoning, if adopted, is exactly what the *Mayo* court warned against: an unchecked expansion of the law-of-nature exception to patent eligibility under § 101 that could "eviscerate patent law." The R&R sets an incorrectly high bar to patent eligibility for methods of treatment. But there is no basis in statute or case law to expand the law-of-nature exception to patent eligibility to invalidate claims directed to novel methods of treating patients, including claims that involve a "new and useful improvement" in the way a known active molecule is used to treat a particular patient population.

## IV. CONCLUSION

For the foregoing reasons, the Court should reject the R&R and deny Actavis's motion to dismiss.

| | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
| --- | --- |
| | */s/ Stephen J. Kraftschik* |
| | _____ |
| OF COUNSEL: | Jack B. Blumenfeld (#1014) |
| | Stephen J. Kraftschik (#5623) |
| Jonathan D. Loeb | 1201 North Market Street |
| DECHERT LLP | P.O. Box 1347 |
| 2440 West El Camino Real, Suite 700 | Wilmington, DE 19899 |
| Mountain View, CA 94040 | (302) 658-9200 |
| (650) 813-4800 | jblumenfeld@mnat.com |
| | skraftschik@mnat.com |
| Martin J. Black | |
| DECHERT LLP | *Attorneys for Plaintiffs* |
| Cira Centre | |
| 2929 Arch Street | |
| Philadelphia, PA 19104 | |
| (215) 994-4000 | |
| | |
| Robert D. Rhoad | |
| DECHERT LLP | |
| 902 Carnegie Center, Suite 500 | |
| Princeton, NJ 08540 | |
| (609) 955-3200 | |

*Attorneys for Endo Pharmaceuticals Inc.*

October 13, 2015
9552269.1

**CERTIFICATION PURSUANT TO STANDING ORDER
<u>RELATING TO OBJECTIONS FILED UNDER FED. R. CIV. P. 72</u>**

Plaintiff Endo Pharmaceuticals Inc. hereby certifies, pursuant to the Court's Standing Order of October 9, 2013 relating to objections filed under Fed. R. Civ. P. 72, that its objections to the Report and Recommendation do not raise new factual or legal arguments that were not presented to Magistrate Judge Thynge.

*/s/ Stephen J. Kraftschik*

Stephen J. Kraftschik (#5623)

# CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2015, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused to be served copies of the foregoing document on October 13, 2015, upon the following in the manner indicated:

| | |
|---|---|
| Adam W. Poff, Esquire<br>Robert M. Vrana, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR<br>1000 North King Street<br>Wilmington, DE  19801<br>*Attorneys for Defendants Actavis Inc.*<br>*and Actavis South Atlantic LLC* | *BY ELECTRONIC MAIL* |
| Charles Weiss, Esquire<br>HOLLAND & KNIGHT LLP<br>31 West 52nd Street<br>New York, NY  10019<br>*Attorneys for Defendants Actavis Inc.*<br>*and Actavis South Atlantic LLC* | *BY ELECTRONIC MAIL* |

*/s/ Stephen J. Kraftschik*

Stephen J. Kraftschik (#5623)