IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| ENDO PHARMACEUTICALS INC. and MALLINCKRODT LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 14-1381-RGA |
| ACTAVIS INC. and ACTAVIS SOUTH ATLANTIC LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**ACTAVIS'S RESPONSE TO ENDO'S OBJECTIONS
TO THE REPORT AND RECOMMENDATION
REGARDING DISMISSAL UNDER 35 U.S.C. § 101**

YOUNG CONWAY STARGATT & TAYLOR LLP
Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
*apoff@ycst.com*
*rvrana@ycst.com*

OF COUNSEL:

HOLLAND & KNIGHT LLP
Charles Weiss
31 West 52nd Street
New York, NY 10019
(212) 513-3551
charles.weiss@hklaw.com

*Attorneys for Defendants Actavis Inc. and
Actavis South Atlantic LLC*

Dated: October 30, 2015

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

I.     The R&R correctly concluded that the '737 patent's claims were invalid as claiming an unpatentable law of nature ...................................................................... 2

     A.     The '737 patent's claims are directed to the law of nature that bioavailability of oxymorphone is increased in patients with renal impairment ............................................................................................................ 3

     B.     The R&R correctly concluded that nothing in the '737 patent's claims transforms them into patent-eligible subject matter ............................................... 4

     C.     The R&R correctly found that the '737 patent claims would preempt future inventions and discoveries in the field ........................................................ 6

     D.     The R&R's reasoning would not lead to invalidation of all method-of-treatment patents ................................................................................................... 8

II.     If the Court finds that the R&R is in error, the Court should remand Actavis's motion to dismiss to the Magistrate Judge for further consideration of the alternate ground of no induced infringement .................................................................................. 8

CONCLUSION ....................................................................................................................... 9

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
   134 S. Ct. 2347 (2014) ........................................................................................ 1, 2, 5, 6

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
   659 F.3d 1057 (Fed. Cir. 2011) ........................................................................................ 5

*Classen Immunotherapies, Inc. v. Biogen IDEC*,
   Civ. No. WDQ-04-2607, 2012 WL 326491 (D. Md. Aug. 9, 2012) ................................. 6

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) ............................................................................................ passim

STATUTES

35 U.S.C. § 101 ..................................................................................................................... 1

## INTRODUCTION

The Magistrate Judge correctly applied clear Supreme Court precedent in finding in her Report and Recommendation ("R&R") that Counts I, III, and IV of Endo's Complaint regarding U.S. Patent No. 8,808,737 ("the '737 patent") should be dismissed for failure to state a claim because the '737 patent claims unpatentable subject matter under 35 U.S.C. § 101. The Supreme Court in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1297 (2012), held that a patent "could not simply recite a law of nature and then add the instruction 'apply the law.'" Endo's objections to the R&R are inconsistent with clear Supreme Court precedent by arguing that an instruction to apply a law of nature—which here is taking account of kidney function in "administering" an old drug for an old purpose—renders patentable natural laws. But patent eligibility should not "depend simply on the draftman's art." *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2359 (2014). The '737 patent does not avoid invalidity simply because Endo included in the claims an "administering" step that is a trivial addition to the exact type of subject matter held unpatentable in *Mayo*, which claimed using a measurement of blood levels to "indicate a need to decrease the amount of said drug subsequently administered."

## FACTUAL BACKGROUND

In this lawsuit, Endo alleges that Actavis has infringed the '737 patent and U.S. Patent 8,871,779 (which is not at issue on this motion) by (i) selling an FDA-approved extended-release formulation of oxymorphone, and (ii) submitting an Abbreviated New Drug Application ("ANDA") seeking FDA approval for a different formulation of the same drug. Actavis moved to dismiss Endo's claims for direct, contributory, and induced infringement of the '737 patent, showing that (1) all claims of the '737 patent are directed to an unpatentable law of nature under 35 U.S.C. § 101, and (2) the Complaint failed to state a claim for indirect infringement and cannot state a claim against Actavis for direct infringement. The R&R found that the '737

patent's claims were unpatentable, and did not reach the issue of whether Endo had adequately pled indirect infringement.

Claim 1 of the '737 patent is representative of all of the '737 patent's claims:

1. A method of treating pain in a renally impaired patient, comprising the steps of:

    a. providing a solid oral controlled release dosage form, comprising:

        i. about 5 mg to about 8 mg of oxymorphone or a pharmaceutically acceptable salt thereof as the sole active ingredient; and

        ii. a controlled release matrix;

    b. measuring a creatinine clearance rate of the patient and determining it to be (a) less then about 30 ml/min, (b) about 30 mL/min to about 50 mL/min, (c) about 51 mL/min to about 80 mL/min, or (d) above about 80 mL/min; and

    c. orally administering to said patient, in dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief;

    wherein after said administration to said patient, the average AUC of oxymorphone over a 12-hour period is less than about 21 ng·hr/mL.

The dependent claims modify either the value or the specified measurement of the final "wherein" clause, and do not affect the present analyses.

## ARGUMENT

**I.    The R&R correctly concluded that the '737 patent's claims were invalid as claiming an unpatentable law of nature**

*Alice* and *Mayo* set forth a two-part test of patent eligibility. "First, a court must determine if a relevant claim is 'directed to one of those patent ineligible concepts,' *i.e.*, a law of nature, natural phenomenon, or an abstract idea. If so, then the court must ask, 'what else is there in the claims before us?'" D.I. 51 at 9-10 (citing *Alice*, 134 S. Ct. at 2355).

### A. The '737 patent's claims are directed to the law of nature that bioavailability of oxymorphone is increased in patients with renal impairment

The R&R recognized that Endo conceded in its original opposition brief that the relevant claims are directed to a law of nature; Endo wrote that "it is true that the claimed inventions relate to the unexpected discovery that the bioavailability of oxymorphone is increased in patients with renal impairment." D.I. 51 at 13 n. 70 (quoting D.I. 18 at 14). Endo's argument that the invention is directed instead to a "new and useful regimen for treating pain in a specific patient population" is flatly contradicted by the '737 patent specification, which states that oxymorphone and other morphine derivatives have been used for treating pain for decades ('737 patent at 1:9-32), and that controlled release oxymorphone was approved by the FDA in 2006, four years before the filing date of the '737 patent ('737 patent at 3:40-49). The specification describes the invention in simplest form as nothing more than providing prior art controlled-release oxymorphones tablet and "informing the patient or the patient's prescribing physician that the bioavailability of oxymorphone is increased in patients with renal impairment." '737 patent at 2:29-34. There is no question that the claims are directed to the law of nature that "the bioavailability of oxymorphone is increased in patients with renal impairment."

That Endo drafted its claims to require administration of a dosage of a drug (D.I. 56 at 3-4) does not show that the claims are to a new and useful process rather than a law of nature, as Endo suggests. The claims' step of "administering" the drug is "insignificant post-solution activity." *Mayo*, 132 S. Ct. at 1298 (quoting *Diamond v. Diehr*, 450 U.S. 175, 191-92 (1980)). *Mayo* held unpatentable claims that included the step of "determin[ing] the level of the relevant metabolites in the blood, through whatever process the doctor or the laboratory wishes to use," because "scientists routinely measured metabolites as part of their investigations into the relationships between metabolite levels and efficacy and toxicity of thiopurine compounds." *Id.*

3

Here, the "administering" step Endo relies on to argue for patent-eligibility calls for an even more routine activity: giving an old drug (oxymorphone) for its known purpose (reducing pain). There is nothing "new and useful," to use Endo's words (D.I. 56 at 3), about using the smallest effective dose of a drug, or giving less to patients who need (or can only tolerate) less.

### B. The R&R correctly concluded that nothing in the '737 patent's claims transforms them into patent-eligible subject matter

The '737 patent claims: (1) providing a controlled release dosage of oxymorphone; (2) measuring a creatinine clearance rate, which is used to measure renal impairment; and (3) administering to the patient a lower dose of oxymorphone dependent on the creatinine clearance rate measured. Neither Endo's opposition brief nor its objections to the R&R argue that the "providing" step or the "measuring" step provide patent-eligible subject matter. D.I. 18 at 14-20; D.I. 56 at 3-9. Nor do they. *Mayo*, 132 S. Ct. at 1297-98 (steps directed to routine and conventional medical activities do not provide patentable subject matter to laws of nature).

The R&R correctly found that the '737 patent's "administering" step is analogous to the "indicates a need" steps in *Mayo*. The "measuring" and "administering" steps of the '737 patent are strikingly similar to the "determining" and "wherein" steps held unpatentable in *Mayo*, as shown by the following table:

| **Claim 1 of the *Mayo* patent <br> 132 S. Ct. at 1295** | **Claim 1 of the '737 patent** |
|---|---|
| (b) determining the level of 6-thioguanine in said subject having said immune-mediated gastrointestinal disorder, | b. measuring a creatinine clearance rate of the patient and |
| wherein the level of 6-thioguaninine less than about 230 pmol per $8 \times 10^8$ red blood cells | determining it to be (a) less than about 30 mL/min, (b) about 30 mL/min to about 50 mL/min, (c) about 51 mL/in to about 80 mL/min, or (d) above about 80 mL/min; and |
| indicates a need to increase the amount of said | c. orally administering to said patient, in |

4

| | |
|---|---|
| drug subsequently administered to said subject and<br><br>wherein the level of 6-thioguanine greater than about 400 pmol per $8 \times 10^8$ red blood cells indicates a need to decrease the amount of drug subsequently administered to said subject. | dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief<br><br>wherein after said administration to said patient, the average AUC of oxymorphone over a 12-hour period is less than about 21 ng·hr/mL. |

Both the *Mayo* claim and the '737 patent claim providing or administering an old drug for a known purpose, running lab work, and setting the dose of drug based on the results. The only distinction is that the lab work in *Mayo* "indicates a need" to increase or decrease the drug, while the '737 patent says to actually do it. But this is a distinction without a difference: there is no meaningful addition to the law of nature in either claim. Contrary to Endo's argument that requiring a physician to "apply that knowledge in [a] practical, tangible way" (D.I. 56 at 5) renders a claim patentable, the Supreme Court clearly held that "one must do more than simply state the law of nature while adding the words 'apply it.'" *Mayo*, 132 S. Ct. at 1294.

The Magistrate Judge also correctly distinguished the *Classen* series of cases. First, Endo's reliance on *Classen Immunotherapies, Inc. v. Biogen IDEC*, 659 F.3d 1057 (Fed. Cir. 2011) (*Classen I*), is misplaced because it is no longer good law after *Mayo* and *Alice*. It does not matter that the Federal Circuit suggested in 2011 that stating the abstract idea of comparing data on vaccination schedules and telling a doctor to "apply it" by administering vaccines according to the preferred schedule rendered a claim patentable, when the Supreme Court held in 2012 in *Mayo* that merely adding an application step does not render a claim patentable. Indeed, *Classen I* expressly relied on principles that *Mayo* rejected, i.e., the proposition that adding a physical act to an unpatentable scientific principle renders the claim patent-eligible. *See Classen I*, 659 F.3d at 1067-68 ("In contrast, the claims of the '139 and '739 patents require the further act of immunization in accordance with a lower-risk schedule, thus moving from abstract

5

scientific principle to specific application."). And if this was not enough, the Supreme Court's admonition in *Mayo*, 132 S. Ct. at 1299-1300, and *Alice*, 134 S. Ct. at 2358-59, against finding claims to be patentable solely due to the inclusion of an application step, thus overturned *Classen I*'s suggestion that adding an application step rendered a claim patentable.

Second, the subsequent decision of the District of Maryland on remand in *Classen Immunotherapies, Inc. v. Biogen IDEC*, Civ. No. WDQ-04-2607, 2012 WL 326491 at \*4-\*5 (D. Md. Aug. 9, 2012) (*Classen II*), apart from not being binding precedent on this Court, distinguished *Mayo* on the ground that the "application" step in *Mayo* was "well-understood, routine, conventional activity previously engaged in by scientists who work in the field," whereas there was no evidence that the immunization schedules at issue in *Classen II* were conventional activity. As the R&R correctly noted, the '737 patent recognizes that the administration of oxymorphone for pain relief is well-understood, routine, conventional activity, making it equivalent to the patent-ineligible claim of *Mayo*, not the claim held to be patent-eligible in *Classen II*. D.I. 51 at 16. Notably, the '737 patent claim does not require administration of oxymorphone on any particular schedule or in any particular unusual way; it merely requires the step of "administering to said patient, in dependence on which creatinine clearance rate is found, a lower dosage of the dosage form to provide pain relief." *Mayo* similarly warned that its "determining" step was "set forth in highly general language covering all processes that make use of the correlations after measuring metabolites, including later discovered processes that measure metabolite levels in new ways. 132 S. Ct. at 1302.

### C. The R&R correctly found that the '737 patent claims would preempt future inventions and discoveries in the field

Endo claims that the '737 patent is "limited to a specific method of treating a very particular patient population (renally impaired patients) using a very particular drug (controlled

6

release oxymorphone) in a very particular way (reducing the dosage in dependent [sic] upon the patients' creatinine clearance rate)." D.I. 56 at 9. So, too the *Mayo* patent was limited to a specific method of treating a very particular patient population (patients with immune-mediated gastrointestinal disorder) using a very particular drug (6-thioguanine) in a very particular way (increasing or reducing the dosage dependent on whether the patient's 6-thioguanine level was below or above the range of 230-400 pmol per $8 \times 10^8$ red blood cells). 132 S. Ct. at 1295. The Supreme Court explicitly rejected the exact same argument Endo makes here:

> In any event, our cases have not distinguished among different laws of nature according to whether the principles they embody are sufficiently narrow. And this is understandable. Courts and judges are not institutionally well suited to making the kinds of judgments needed to distinguish among different laws of nature. And so the cases have endorsed a bright-line prohibition against patenting laws of nature, mathematical formulas and the like, which serves as a somewhat more easily administered proxy for the underlying "building-block" concern.

132 S. Ct. at 1303 (citations omitted).

The '737 patent, if it were held patentable, would dangerously preempt good pharmaceutical and good medical practice. In the '737 patent, Endo did nothing more than observe how a drug was metabolized in patients with kidney disease, and attempt to claim a monopoly on good medical practice (adjusting the dosage of medicine in patients who need or can tolerate less). The '737 patent seeks to prevent doctors from applying the good medical practice of adjusting the dosage of an opiate painkiller to reduce side effects while maintaining efficacy, and to prevent generic pharmaceutical companies from providing doctors with basic medical information that can be helpful to their prescribing practices. These are among the policy concerns that the patentable subject matter doctrine, and its focus on preemption, are designed to address. *See Mayo*, 132 S. Ct. at 1302.

The Court in *Mayo* recognized the problem, raised by *amici* including the American Medical Association and the American Hospital Association, that if "claims to exclusive rights over the body's natural responses to illness and medical treatment are permitted to stand, the result will be a vast thicket of exclusive rights over the use of critical scientific data that must remain widely available if physicians are to provide sound medical care." 132 S. Ct. at 1304. Putting medical information on the label of a drug, getting a patent, and then suing others for infringement because they include that information on their labels is at the core of such concerns.

### D. The R&R's reasoning would not lead to invalidation of all method-of-treatment patents

As explained in this brief and the R&R, the '737 patent's claims are not patent-eligible subject matter—and can be found to be patent-ineligible on a motion to dismiss—because the patent itself states that all of the claim elements other than the law of nature are routine and conventional activity. Endo's "sky is falling" argument is largely nonsense. An inventor can still discover that a known drug has some hitherto-unknown uses (as for different indications) and claim a method of using that drug for the new use. The R&R stands only for the unremarkable proposition that one cannot observe the way the body metabolizes an old drug used for an old purpose, and seek to patent the use of that knowledge.

### II. If the Court finds that the R&R is in error, the Court should remand Actavis's motion to dismiss to the Magistrate Judge for further consideration of the alternate ground of no induced infringement

Actavis's motion to dismiss raised two grounds for dismissal: (1) invalidity of the '737 patent for claiming unpatentable subject matter, and (2) failure to state a claim of induced infringement against Actavis. The Magistrate Judge, having found the patent invalid, did not need to reach the issue of inducement. D.I. 51 at 18. Accordingly, if the Court does not adopt the R&R, the motion to dismiss will not have been resolved completely, and the issue of whether

Endo sufficiently pled infringement of the '737 patent should be returned to the Magistrate Judge (or decided in the first instance by the Court as it sees fit).

## **CONCLUSION**

For the foregoing reasons, Actavis respectfully urges the Court to adopt the Magistrate Judge's Report and Recommendations and dismiss Counts I, III, and IV of the Complaint.

|  |  |
|---|---|
|  | YOUNG CONAWAY STARGATT & TAYLOR, LLP |
| Of Counsel: | */s/ Robert M. Vrana* <br> Adam W. Poff (No. 3990) |
| HOLLAND & KNIGHT LLP <br> Charles A. Weiss <br> 31 West 52nd Street <br> New York, NY 10019 <br> (212) 513-3551 <br> charles.weiss@hklaw.com | Robert M. Vrana (No. 5666) <br> Rodney Square <br> 1000 North King Street <br> Wilmington, DE 19801 <br> (302) 571-6600 <br> *apoff@ycst.com* <br> *rvrana@ycst.com* |
| Dated: October 30, 2015 | *Attorneys for Defendants Actavis Inc. and Actavis South Atlantic LLC* |

01:17916345.1

# CERTIFICATE OF SERVICE

I, Robert M. Vrana, hereby certify that on October 30, 2015, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Jack B. Blumenfeld, Esquire
> Morris Nichols Arsht & Tunnell LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347
> *jblumenfeld@mnat.com*

> *Attorneys for Plaintiffs*

I further certify that on October 30, 2015, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel and on the following:

> Jonathan D.J. Loeb, Esquire
> Dechert LLP
> 2440 W. El Camino Real
> Suite 700
> Mountain View, CA 94040
> *jonathan.loeb@dechert.com*

> Martin J. Black, Esquire
> Sharon K. Gagliardi, Esquire
> Julie M. Latsko, Esquire
> Joseph J. Gribbin, Esquire
> Dechert LLP
> Circa Centre
> 2929 Arch Street
> Philadelphia, PA 19104
> *martin.black@dechert.com*
> *sharon.gagliardi@dechert.com*
> *julie.latsko@dechert.com*
> *joseph.gribbin@dechert.com*

Robert D. Rhoad, Esquire
Brian Goldberg, Esquire
Dechert LLP
902 Carnegie Center, Suite 500
Princeton, NJ 08540
*robert.rhoad@dechert.com*
*brian.goldberg@dechert.com*

Blake B. Greene, Esquire
Dechert LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
*blake.greene@dechert.com*

*Attorneys for Plaintiff Endo Pharmaceuticals Inc.*

Jeffrey J. Toney, Esquire
Marcus A. Barber, Esquire
Kasowitz, Benson, Torres & Friedman LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
*jtoney@kasowitz.com*
*mbarber@kasowitz.com*

Rodney R. Miller, Esquire
Paul G. Williams, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1349 W. Peachtree Street, N.W., Suite 1500
Atlanta, GA 30309
*rmiller@kasowitz.com*
*pwilliams@kasowitz.com*

*Attorneys for Plaintiff Mallinckrodt LLC*

Dated: October 30, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Robert M. Vrana
Adam W. Poff (No. 3990)
Robert M. Vrana (No. (5666)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
*rvrana@ycst*.com

*Attorneys for Defendants*

2